In re TMA ASSOCIATES, LTD., Debtor.

**AFFILIATED NATIONAL BANK— ENGLEWOOD, Appellant,**

v.

**TMA ASSOCIATES, LTD., a Colorado Limited Partnership, Appellee.**

No. 92–B–2177.

United States District Court, D. Colorado.

Nov. 1, 1993.

Steven E. Abelman, Andrea L. Sanderson, Berryhill, Cage & North, P.C., Denver, CO, for appellant.

Vicki S. Porter, Vicki S. Porter, P.C., Mark Fulford, Sherman & Howard, Denver, CO, for appellee.

MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Debtor/Appellee TMA Associates, Ltd. (TMA) objects to the August 24, 1993 Recommendation of United States Magistrate Judge (the recommendation) recommending that the order of confirmation by the bankruptcy court be reversed. The issue initially raised on appeal is whether TMA's Chapter 11 reorganization plan (the plan) meets the requirements of 11 U.S.C. § 1129. Appellant specifically argues that the plan fails to comply with § 1129(b)(2)(A), § 1129(a)(1), and § 1129(a)(11) of the Bankruptcy Code. For the reasons set forth below, I will affirm the confirmation order of the bankruptcy judge.

I.

Affiliated National Bank—Englewood (Bank) appeals the bankruptcy court's confirmation of TMA's Chapter 11 plan of reorganization. I have jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). I referred this matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(a) and (b) for a recommendation. On August 24, 1993, the Magistrate Judge recommended that the order of confirmation by the bankruptcy court be reversed, and that the case be remanded with directions that TMA's Chapter 11 petition be dismissed. TMA filed an objection to· the Magistrate's recommendation. Oral arguments were presented on Friday, October 29, 1993.

TMA is a Colorado limited partnership that was formed in July 1985 solely for the purpose of purchasing, developing and selling certain commercial real estate in Thornton, Colorado (the property). The sole asset of TMA is the property. TMA has no employees and no source of income other than from future sales of the property.

There are few unsecured creditors, with total unsecured debt in the approximate amount of $3,500. The only secured creditor is the Bank which holds a mortgage on the property as security on a loan in the approximate amount of one million dollars. The Bank made the loan to TMA in 1985 with a term of six months for the purpose of TMA's acquisition of the property. The develop-

ment of the property did not progress as planned. The loan was in default after six months. Extensions for payment were granted six times. In March 1989 the Bank issued a demand letter to TMA declaring default.

Shortly before the date of foreclosure on the property, TMA filed a petition under Chapter 11. With the filing of the petition, the foreclosure was stayed. The amount due and owing to the Bank remains in excess of one million dollars.

The plan for reorganization under Chapter 11 was confirmed by Bankruptcy Judge Brooks on October 21, 1992. The plan provides that the Bank will be paid from future property sales. In the event such sales do not materialize, TMA is required to make certain nominal payments. The Bank is to earn interest at the rate of 9.75% per year, although TMA is obligated to pay only $30,000 per year for two years, with unpaid interest to be accrued along with the principal. These nominal payments are guaranteed by the Benson Mineral Group (BMG), a corporation owned by TMA's limited partner, Mr. Bruce Benson. If the payments are not made, the Bank is entitled to foreclose on the property. In addition, TMA is to pay taxes and assessments on the property during the time the plan is in operation. If two years of these minimal payments are made, then TMA may continue with the $30,000 per year payments to the Bank for an additional three years. At the end of five years, if the plan has not been completed, the Bank may resume foreclosure proceedings.

The plan employs a feature called negative amortization wherein TMA is not required to service even the interest portion of the debt as it accrues. The unpaid interest which accrues, but is unpaid, is added to· the outstanding principal. Negative amortization results in the indebtedness actually increasing over time.

The plan also provides for partial release of the deed of trust on the secured property. A partial release is to be provided to TMA if payment of $1.95 per square foot is paid for part of the property, with that amount being the lowest sale amount allowable under the

plan. The underlying deed of trust does not provide for partial releases, but the Bank has allowed partial releases in the past for sales of part of the property.

The bankruptcy court approved the plan finding that the property had a value of $1.8 million to $2.0 million. The bankruptcy court found that there was sufficient protection for the Bank in the property to protect it in the short-term and middle-term.

The Bank filed an objection to the plan. The unsecured creditors approved the plan. The bankruptcy court then confirmed the plan over the objection of the Bank, with a modification of the deed of trust to allow for partial sales of the property. The Bank then filed this timely appeal.

## II.

### A. Standard of Review

In reviewing a bankruptcy court's decision, the district court functions as an appellate court and is authorized to affirm, reverse, modify or remand the bankruptcy court's ruling. Bankr.R. 8013. District courts review factual findings under the clearly erroneous standard while conclusions of law are reviewed de novo. Bartmann v. Maverick Tube Corp., 853 F.2d 1540, 1543 (10th Cir.1988). A factual finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id.

Application of this standard of review is dispositive in this case. The Magistrate Judge reviewed the issues on appeal de novo and concluded, as a matter of law, that the plan was neither fair and equitable, nor feasible. I conclude that greater deference is due the bankruptcy court's resolutions of these issues under the clearly erroneous standard. The determinations as to whether a reorganization plan is fair and equitable and feasible are fact intensive. These mixed questions of law and fact should not be overturned unless clearly erroneous. See Citibank, N.A. v. Baer, 651 F.2d 1341, 1346 (10th Cir.1980); In re Acequia, Inc., 787 F.2d 1352, 1358 (9th Cir.1986).

After reviewing the record, I cannot conclude that the bankruptcy court's findings are clearly erroneous. Accordingly, I will affirm the bankruptcy court's confirmation of the plan.

### B. Issues on Appeal

The Bank raises a number of objections to the confirmation of the plan. The Bank first asserts that the plan fails to meet the fair and equitable standard of § 1129(b)(2)(A). Second, the Bank contends that section 1129(a)(1), requiring the plan to comply with other applicable provisions of the Bankruptcy Code, is not satisfied. Finally, the Bank argues that TMA's plan is not feasible as required by section 1129(a)(11) of the Code. The Bank requests that the confirmation order be reversed and the petition dismissed, so that it may continue its foreclosure on the property.

#### 1) 1129(b)(2) Fair and Equitable

Since the Bank, whose rights are impaired under the plan, objected to the plan, TMA had to proceed under 11 U.S.C. § 1129(b)(2), the "cram-down provision." Under section 1129(b)(2), a bankruptcy court is allowed to confirm a plan if it determines that the plan does not discriminate unfairly, it is fair and equitable with respect to each class of claims that does not accept the plan, and all provisions of section 1129(a), except paragraph (8), have been met.

Section 1129(b)(2)(A) lists three alternatives which may support a finding of "fair and equitable." To be fair and equitable, a plan must at a minimum provide that: (1) the secured creditor retain its lien in the claim and that the creditor receive deferred cash payments totalling at least the amount of the claim as of the effective date of the plan; (2) the debtor may sell the collateral with the secured creditor's lien to attach to the proceeds of such sale and that the treatment of such lien is consistent with the other provisions of 1129(b)(2); or (3) the secured creditor receive the "indubitable equivalent" of its claim.

##### a) indubitable equivalent

The bankruptcy court found that TMA's plan provided the Bank with the indu-

bitable equivalent for its claim pursuant to 1129(b)(2)(A)(iii). The court relied on the Tenth Circuit case of *In re Pikes Peak Water Co.*, 779 F.2d 1456 (10th Cir.1985), in reaching this determination.

In *Pikes Peak*, the Tenth Circuit affirmed the order of confirmation for a debtor's plan that required the secured creditor to continue to accrue its fully secured claim for up to three years without payment of principal and interest. The plan in *Pikes Peak* required the debtor to pay the secured claim in full within three years, cure the default in the secured claim, make other financing arrangements satisfactory to the secured creditor, or stipulate to relief from stay. The *Pikes Peak* court held that the secured creditor was receiving the "indubitable equivalent" where it was receiving payment in full over a reasonable period of time, with an appropriate interest or discount factor being paid. *Id.* at 1461. TMA contends that *Pikes Peak* "squares" with the present case and is controlling in that the Bank will be paid in a reasonable time with appropriate interest and there exists a substantial equity cushion to protect the Bank's claim against erosion.

The Magistrate Judge found the bankruptcy court's reliance on *Pikes Peak* to be misplaced. The Magistrate specifically found *Pikes Peak* distinguishable in that the debtor in that case had employees, contracts, cash flow, and a specific plan for repaying debts that was tied to the cash flow, whereas in the present case repayment comes from "speculative" projected land sales.

The Bank makes three arguments supporting its contention that it fails to receive the indubitable equivalent of its claim. The Bank's first argument that it is deprived of the indubitable equivalent of its claim is based on the provision in the plan that provides for partial release upon the sale of a part of the property. The Bank points out that *Pikes Peak* did not involve any such modification of the secured creditor's lien rights. Here, however, the plan imposes a $1.95 per square foot mandatory release provision. The Bank acknowledges that it has previously executed partial releases, but argues that it did not do so for $1.95 per square foot and that the releases were executed voluntarily only after the Bank had performed its due diligence and thoroughly satisfied itself that the proposed sale would not impair the marketability of the Bank's remaining collateral.

Judge Brooks found no persuasive evidence that partial releases would impose a material or significant risk upon the Bank. (Judge Brooks' Oral Ruling, dated October 8, 1992, page 8.) I cannot conclude that this finding was clearly erroneous.

Second, the Bank argues that it is deprived of the indubitable equivalent of its secured claim by the creation of a partially junior and partially senior insider secured creditor which gets paid in full prior to the Bank. The Bank refers to the provision of the plan by which certain advances made by the guarantor would be repaid from sales proceeds after the Bank receives $1.95 per square foot from the sale, but before the Bank receives any excess proceeds.

As TMA points out, if the Bank receives $1.95 per square foot the Bank's claim will, in due course, be paid in full. Therefore, I cannot conclude that the bankruptcy court was clearly erroneous in approving this provision.

Finally, the Bank suggests that it is deprived of the indubitable equivalent of its secured claim because it is exposed to the additional risks and costs related to its lien priority and title insurance. The Bank refers to testimony of Mr. Benjamin who testified that the mandatory partial releases may, and probably will, impair the Bank's lien priority position. The Bankruptcy Judge found that this evidence was not persuasive and that the imposition of partial releases of the deed of trust did not materially or significantly impair the Bank's lien. (Judge Brooks' Oral Ruling, October 8, 1992, page 8.) Rule 8013 requires that I give due regard to the opportunity of the bankruptcy court to judge the credibility of witnesses. The finding of the bankruptcy court has not been shown to be clearly erroneous.

Judge Brooks relied on the Tenth Circuit's decision in *Pikes Peak* in his determination that TMA's plan was confirmable under § 1129 and that the Bank was receiving the

indubitable equivalent of its oversecured claim. I cannot conclude on the record before me that Judge Brooks applied the factors of *Pikes Peak* without specifically considering the unique nature of this case. There is no implication that the confirmation order was entered with anything other than a full appreciation of the facts and circumstances underlying TMA's plan.

### b) negative amortization

■ The Bank also argues that the proposed negative amortization in the plan is not fair and equitable. Negative amortization means that the principal amount of the debt increases over time because interest is not paid at the same rate it accrues. Instead, all or part of the interest is deferred and is added to the principal indebtedness. The applicable case law reveals that negative amortizing plans are disfavored. *See In re Club Associates*, 107 B.R. 385, 398 (Bankr. N.D.Ga.1989). However, such plans are not *per se* inequitable. *Id.*

Although the term negative amortization is not used in the *Pikes Peak* case, the inference is that the Tenth Circuit approved of the concept as the plan in that case provided for no interest or principal payments for up to three years. *In re Pikes Peak*, 779 F.2d 1456, 1459 (10th Cir.1985). The Bank relies on *In re Apple Tree Partners, L.P.*, 131 B.R. 380 (Bankr.W.D.Tenn.1991) in arguing that negative amortization renders the plan inequitable. In *Apple Tree*, the bankruptcy court declined to confirm the debtor's plan because the court concluded the risk of failure was unduly shifted to the secured creditor with the only protection being the debtor's optimism and the equity cushion of the property. The *Apple Tree* court concluded that neither was sufficiently certain or stable to warrant confirmation of the plan. *Id.* at 393–406. I agree that upon appropriate findings of fact, reliance on *Apple Tree* could lead to the conclusion that TMA's plan is not fair and equitable. However, Rule 8013 does not allow me to substitute my findings for those of the bankruptcy judge merely because I find other inferences from the facts to be reasonable. Determining whether a negative amortization provision is fair and equitable under section 1129(b) is a factually intensive exercise. *In re Apple Tree*, 131 B.R. at 397. My role is to determine whether the bankruptcy judge was clearly erroneous in his findings.

The evidence before the bankruptcy court was that the infrastructure for the project is in place and the project has good anchor tenants to attract additional buyers. Judge Brooks cited these factors as providing a strong base for TMA's plan in his ruling. (Judge Brooks' Oral Ruling, October 8, 1992, pages 7–8.) I conclude the bankruptcy judge was not clearly erroneous in his factual findings, nor in his conclusions drawn from these findings.

### 2) 1129(a)(1)

■ Section 1129(a)(1) requires a plan to comply with other applicable provisions of the Bankruptcy Code. The Bank argues that this requirement is not satisfied in that the plan does not comply with section 363(f) of the Code. Section 363(f) provides the conditions under which property may be sold outside the ordinary course of business free and clear of liens in a Bankruptcy proceeding. 11 U.S.C. § 363(f). The protections of § 363(f) do not apply, however, in a cram down pursuant to § 1129(b). *In re Beker Industries Corp.*, 63 B.R. 474, 477 (Bankr. S.D.N.Y.1986). A cram down allows collateralized property to be sold for less than the amount of the entire lien. *Id.* A sale of the debtor's property is permitted under section 1129(b)(2)(A)(ii) if the lien of a secured creditor attaches to the proceeds of the sale to the extent of the allowed amount of the claim or if the secured creditor realizes the indubitable equivalent of its claim. 11 U.S.C. § 1129(b)(2)(A)(ii). Because the protections of § 363(f) do not apply here, there was no need for the bankruptcy judge to address them.

### 3) 1129(a)(11)

■ The Bank's final argument is that the plan is not feasible as required by section 1129(a)(11). The feasibility requirement of § 1129(a)(11) requires that the debtor provide a "reasonable assurance that the plan can be effectuated." *In re Ames*, 973 F.2d 849, 851 (10th Cir.1992). The debtor has the burden of proving feasibility of a plan of reorganization. *Id.*

■ The Magistrate Judge concluded that the plan is not feasible as a matter of law on the basis that any sales projections are purely speculative as a matter of law. The determination of feasibility and the assessment of the debtor's sales projections, however, should not be overturned unless clearly erroneous.

The Bank argues that the bankruptcy court's finding of feasibility is clearly erroneous in that the court adopted the plan based upon revenue projections which contradict the court's own valuation finding. I disagree. The bankruptcy judge found the value of the property to be at least $1.8 to $2.0 million. Using these figures, the square foot value of the property is between $3 and $3.35. If the Bank's claim can be satisfied from sales at $1.95 per square foot, I cannot conclude that the bankruptcy judge was clearly erroneous in finding the plan to be feasible.

■ The Bank makes two additional arguments that the finding of feasibility is clearly erroneous, neither of which I find persuasive. First, the Bank argues that the effective date of the plan is indiscernible. To the contrary, the plan provides that the effective date of the plan is triggered by the confirmation order becoming final. This provision does not render the plan unfeasible.

■ Second, the Bank argues that there was no evidence on the financial feasibility of the guarantor. Likewise, I cannot conclude that lack of evidence in the record as to the financial status of BMG, the guarantor, does not render the plan infeasible.

Accordingly, it is ORDERED that the confirmation order entered by the bankruptcy judge in this matter on October 21, 1992 is AFFIRMED.