**In re DIGITAL IMPACT, INC., Debtor.**

**Bankruptcy No. 97–00806–R.**

United States Bankruptcy Court,
N.D. Oklahoma.

July 22, 1998.

Sidney K. Swinson, Gable, Gotwals, Mock, Schwabe, Kihle & Gaberino, Tulsa, OK, for trustee.

Sam G. Bratton, II, Doerner, Saunders, Daniel & Anderson, Tulsa, OK, for Plan Proponent.

M. Shawn Lawhorn, Jarboe & Stoermer, Tulsa, OK, for Unsecured Creditors Committee.

## MEMORANDUM OPINION AND ORDER

DANA L. RASURE, Chief Judge.

On May 27, 1998, Plan Proponent, Frank S. Dickerson ("Dickerson"), filed his Second Amended Plan of Reorganization of Digital Impact, Inc., amending the First Amended Plan of Reorganization filed on April 8, 1998. On May 27, 1998, a hearing on confirmation of the Second Amended Plan was held. At the conclusion of the hearing, the Court permitted Dickerson and the Chapter 11 Trustee, Sidney K. Swinson (the "Trustee"), to provide authorities on two issues prior to the Court's determination on confirmation. On June 1, 1998, Dickerson filed Plan Proponent's Memorandum in Support of Confirmation. On June 4, 1998, Dickerson filed a request for a hearing so that further argument and possibly additional testimony could be presented in connection with the two outstanding issues. The Court set a hearing for June 17, 1998, and received further argument from counsel for Dickerson and from the Trustee. No additional evidence was offered. The matter of confirmation was taken under advisement.

**Jurisdiction to confirm plan.**

Confirmation of a Chapter 11 plan is a core matter over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and (b)(2)(L).

**Findings of fact.**

**A. Notice.**

On February 27, 1998, Dickerson filed his Plan of Reorganization and Disclosure Statement. A hearing concerning approval of the Disclosure Statement was set for April 8, 1998. On April 8, 1998, Dickerson filed his Amended Disclosure Statement and Amended Plan of Reorganization. On April 8, 1998, the Amended Disclosure Statement was approved and an order was entered setting

May 20, 1998, as the date for submitting acceptances or rejections of the Plan and for filing objections to the Plan. The order also set the confirmation hearing for May 27, 1998.

On May 27, 1998, Dickerson filed his Second Amended Plan. The only substantive modification contained in the Second Amended Plan was the more favorable treatment of Class 10, consisting of Jerry and Louise Short and their affiliates (collectively the "Shorts"). The Shorts, who were represented by counsel at the confirmation hearing, accepted the amended treatment. The more favorable treatment of the Shorts would be funded by Dickerson on the effective date and would not reduce or materially alter the rights of any other interested party. The other modifications contained in the Second Amended Plan were inserted for clarification or were non-material. Accordingly, the Court finds that no additional notice of the amendments contained in the Second Amended Plan is required. The Court finds that notice of the Second Amended Plan (hereinafter the "Plan"), of the deadlines for acceptance/rejection of and for objection to the Plan, and of the date of the confirmation hearing was proper.

## B. Objections.

In the Plan, the administrative claims are relegated to several classes: Class 1 consists of all professional and trustee's fees, to be paid in full on the effective date; Class 2 consists of all administrative claims other than professional and trustee's fees and administrative claims provided for in another class—generally post-petition trade debt—of which 50% is to be paid on the effective date; Class 3 consists of post-petition lenders other than Dickerson, who are to be paid 50% of their claims on the effective date; Class 7 contains the allowed post-petition secured and administrative expense claim of Dickerson, to be paid in full on the effective date; and Class 10 consists of all claims of the Shorts, including their administrative claims, which are to be extinguished by the transfer of the Debtor's interest in a product line and a cash payment of $10,000.

Creditor Council Oak Publishing Co., d/b/a Council Oak Books ("Council Oak") held a Class 2 administrative claim for unpaid post-petition royalties for which the Plan proposed a 50% payment. On April 1, 1998, and May 20, 1998, Council Oak filed objections to confirmation of the Plan, contending that confirmation was improper because the Plan did not provide for the payment of its administrative claim in full, as is required by 11 U.S.C. § 1129(a)(9).

Prior to the confirmation hearing, however, Dickerson paid Council Oak's accrued post-petition royalties in full and promised to maintain post-petition royalties on a current basis pending confirmation, whereupon Council Oak withdrew its objections. No other objections to confirmation were filed.

## C. The Release.

Paragraph 14 of the Plan contains the following language:

14. *Release of Dickerson.* Upon Confirmation, all Claims or causes of action, whether known or unknown, asserted or unasserted, vested or contingent or otherwise which any person bound by this Plan had or may have had against Dickerson which arose or existed prior to Confirmation in any regard respecting or relating to Digital (whether pre-Petition or as Debtor) or the Estate or the administration thereof shall be fully released and discharged. The consideration for this release is Dickerson's capitalization of the reorganized Debtor described elsewhere in the Plan.

Paragraph 14 is hereinafter referred to as the "Release." Paragraph 9(H) of the Plan proposes that the Court retain jurisdiction after confirmation "[t]o enforce the release and discharge of Dickerson provided by the Plan."

## D. Voting.

On the date of the confirmation hearing, Dickerson submitted a "Tabulation of Ballots" and a "Listing of Ballots" to the Court. Of thirteen classes of claims or interests, seven classes were unimpaired: Class 1 (professionals' and U.S. Trustee's administrative claims); Class 4 (allowed priority claim of the Tulsa County Treasurer); Class 5 (allowed

secured and priority claim of Bankers Capital); Class 6 (allowed secured and priority claim of Goodman Factors); Class 7 (allowed post-petition secured and administrative claim of Dickerson); Class 8 (allowed secured claim of NationsBank); and Class 9 (allowed secured claim of Molly McKay—disputed), all of which are presumed to accept the Plan pursuant to 11 U.S.C. § 1126. Six classes were impaired: Class 2 (defined above—generally post-petition trade debt—to be paid at 50%); Class 3 (post-petition lenders other than Dickerson, the Shorts, Goodman Factors and Bankers Capital—to be paid at 50%); Class 10 (all allowed claims of the Shorts—to be satisfied by transfer of a product line and $10,000 cash); Class 11 (all allowed unsecured claims other than Dickerson's unsecured claim—to be paid at 5%); Class 12 (allowed unsecured claim of Dickerson—no cash distribution); and Class 13 (interests—to be canceled). *See* Plan at ¶ 4. All payments provided for under the Plan are to occur on the effective date. In exchange for waiving his unsecured claim and for funding the cash-out treatment of all classes of creditors on the effective date, Dickerson is to acquire 50,000 of 100,000 authorized shares of new common stock in the Reorganized Debtor, and will become president of the Reorganized Debtor, whereupon the Court's oversight and supervision of the Debtor is to cease. See Plan at ¶¶ 5, 6.

The result of the balloting was as follows:

*Unimpaired classes*

Unimpaired classes, and each member thereof, are conclusively deemed to accept the Plan; however some unimpaired creditors chose to vote anyway, as follows:

Class 4: 1 creditor accepted, representing $1,324.00

Class 5: 1 creditor accepted, representing $8,766.47

Class 6: no creditors voted

Class 7: 1 creditor accepted, representing $50,000

Class 8: no creditors voted

Class 9: 1 creditor accepted representing $12,527.83

*Impaired classes*

Class 2: 6 creditors accepted, representing $36,961.14

Class 3: 5 creditors accepted, representing $65,543.00

Class 10: 4 creditors accepted, representing $261,495.93

Class 11: 32 creditors accepted, representing $464,055.10; 5 creditors rejected, representing $109,761.48

Class 12: 1 creditor accepted, representing $594,557.00

Class 13: 15 interest holders accepted; 11 interest holders rejected; however class is deemed to reject pursuant to 11 U.S.C. § 1126(g)

There was one creditor/interest holder who voted to reject the Plan in class 3, 11 and 13 but her ballot was received out of time.

Although there were sufficient votes, in number and amount, to approve the Plan pursuant to Section 1126(c) of the Bankruptcy Code, not all creditors or interest holders submitted a ballot. Of approximately fifty-five creditors who submitted proofs of claim (and whose claims were not disallowed), seventeen did not vote. *See* Claims Register and Listing of Ballots. Of seventy shareholders, forty-four did not vote. *See* "Exhibit A" to the Petition of the Debtor. Of thirteen Class 2 post-petition creditors, seven did not vote. *See* "Exhibit A" to Plan Proponent's Memorandum in Support of Confirmation. And of eight Class 3 unsecured post-petition lenders, two did not vote and one voted to reject the Plan, albeit tardily.

### E. Feasibility and Liquidation Analysis.

The Chapter 11 Trustee, Sidney K. Swinson (the "Trustee"), supported the Plan as undoubtedly beneficial to pre-petition and pre-confirmation creditors. The Trustee testified that in order to fund the cash-out obligations, Dickerson would be required to invest approximately $213,000; the Trustee was satisfied Dickerson had $213,000 available in current liquid assets. Dickerson also waived his unsecured claim of $594,557.

In the Trustee's opinion, liquidation of the estate would result in a $75,000 distribution, an amount that would not satisfy the existing administrative expenses, which consist of ap-

proximately $90,000 in post-petition borrowing, $60,000 in professional fees, and $60,000 in post-petition trade payables. Moreover, liquidation would result in additional administrative expenses, the source of payment of which is questionable. The Trustee estimated that liquidation would result in a 15% return to the administrative claimants. While Class 2 post-petition trade payable creditors are to be paid 50% of their claims under the Plan, their return upon liquidation would be less. And while Class 11 unsecured claimants are to be paid only 5% under the Plan, they would realize no return in a liquidation. In summary, the Trustee concluded that Dickerson's proposal was the best alternative presently available to the constituents of the estate. The Trustee also expressed confidence in Dickerson's business acumen and ability to succeed in the operations of the Reorganized Debtor.

**Conclusions of law.**

■ At the confirmation hearing, the Court expressed concern that the Plan did not comply with Section 1129(a)(9) because the Plan did not provide priority administrative claimants with payment in full. Further, the Court questioned whether it had jurisdiction or power to enter an order releasing and discharging Dickerson from claims relating to his participation in the business of Digital. Notwithstanding that there were no unresolved objections to the Plan, this Court has an independent duty to ensure that the Plan complies with all provisions of Section 1129 of the Bankruptcy Code and to determine the scope of its jurisdiction. *See In re Sacred Heart Hospital,* 182 B.R. 413, 423 (Bankr. E.D.Pa.1995). Because of the Court's concerns, interested parties were given an opportunity to provide additional authorities to support their position that a plan proposing payment of less than 100% of the administrative expenses was confirmable and that the Court had authority to enter an order releasing Dickerson. Interested parties were also given an opportunity for additional argument. The matters now having been fully briefed and argued, the Court makes the following conclusions of law as required by Bankruptcy Rule 7052.

**A. Section 1129(a)(9).**

■ Section 1129(a)(9) states that—
The court shall confirm a plan only if all the following requirements are met:

 \* \* \* \* \* \*

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim . . .

11 U.S.C. § 1129(a)(9)(A). The kinds of claims specified in Section 507(a)(1) are "administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28 [trustee's fees]," which are given *first* priority in connection with payment by the estate. 11 U.S.C. § 507(a)(1). Section 503(b) expenses include "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). Such costs and expenses encompass, without limitation, post-petition professional fees, salaries, wages, supplies, rent, utilities and other trade payables—all those ongoing operating and case administration expenses that would not likely be supplied on credit to a chapter 11 debtor without the protection of Section 507(a)'s priority scheme and Section 1129(a)(9)'s requirement that these administrative expenses be paid in cash and in full on the effective date of the plan.

■ The Plan in this case fails to comply with Section 1129(a)(9) on its face. The Plan proposes the payment of only 50% of administrative expenses (except for those which have been separately classified, such as professional fees, Dickerson's administrative claim, and the Shorts' administrative claim).

■ Section 1129(a)(9) provides one loophole to the strict mandate for full payment: the "holder of a particular claim" may agree to a different treatment of its claim. In this

vein, Dickerson argues, citing *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir. 1988), that if a majority of those claimants in a class who submitted ballots elect to accept a plan, then *all* members of a class are deemed to have accepted the plan under Section 1126(c), and therefore each member is deemed to have *agreed* to waive the right to full payment. Hence, Dickerson argues that because six Class 2 claimants and five Class 3 claimants voted to accept the Plan and no claimants in either class voted to reject the Plan, all members of Class 2 and Class 3 have agreed to accept payment of only 50% of their claims. This Court does not agree.[1]

The language of Section 1129(a)(9) specifically requires *each holder* of each "particular claim" to enter into an agreement with the plan proponent to waive the right to payment of administrative expenses in full. This Court concludes that in order to waive the protection of Section 1129(a)(9)(A), a claimant must individually and affirmatively agree to such treatment. *See also In re Jankins,*

184 B.R. 488, 492 n. 8 (Bankr.E.D.Va.1995) (failure of priority claimant to object to treatment less favorable than that required by Section 1129(a)(9) is not consent to such treatment; an affirmative concurrence by the creditor is required); *In re St. Louis Freight Lines, Inc.*, 45 B.R. 546, 552 n. 9 (Bankr. E.D.Mich.1984) (IRS was bound by the plan's treatment, even though less favorable than it was entitled to as a priority administrative tax claimant, because it had "expressly 'approved' the order confirming the plan.").

This reasoning is supported by Section 1123(a)(1) which provides for classification of claims, but specifically excepts from classification claims under Section 507(a)(1)— priority administrative claims. Because these post-petition creditors are entitled to be paid in full, "there is no reason to create a class or classes for such claims in light of the fact that a majority of such classes cannot bind a minority to less favorable payment terms than those provided under section 1129(a)(9)." 7 COLLIER ON BANKRUPTCY ¶ 1129.03[9][a].[2]

1. This Court finds that the holding in *In re Ruti–Sweetwater* is narrower than that urged by Dickerson. Under *Ruti–Sweetwater*, non-voting, non-objecting creditors are deemed to have accepted the proposed plan *for the purpose of sections 1129(a)(8) and 1129(b)*, that is, for the purpose of determining whether the plan may be "crammed down" in the face of a rejecting class or classes of creditors. *See Ruti–Sweetwater*, 836 F.2d at 1265–66. The Court does not consider a "deemed" acceptance by inaction equivalent to the affirmative consent required to override the clear mandate of Section 1129(a)(9).

2. As exemplified by the resolution of the objection of Council Oak, an administrative claimant who is savvy enough to object to the Plan on the ground that it does not comply with Section 1129(a)(9) may be paid in full in the "ordinary course" in order to eliminate (1) the claimant's standing to object to confirmation (*see In re Sacred Heart Hospital*, 182 B.R. 413, 423 (Bankr. E.D.Pa.1995)) and (2) the objecting claimant's right to vote on the Plan, no longer having a claim. By following this strategy, Digital eliminated Council Oak's incentive to argue the merits of its Section 1129(a)(9) objection. Certain other administrative claimants who Digital anticipated would challenge the Plan on these grounds were classified separately and proposed to be paid in full, *i.e.*, professionals and trustee's fees (Class 1) and Dickerson's contribution to post-petition operations (Class 7). The Shorts (Class 10) contributed post-petition operating funds as well, and, with their counsel, they negotiated a cash pay-

ment and the ownership of a product line— clearly agreeing to an alternative to full payment in cash as contemplated by Section 1129(a)(9). Those post-petition trade creditors who did not object to the Plan were not given the same opportunity to be paid in full prior to the confirmation hearing as Council Oak, or the same opportunity to be placed in Class 1 and paid in full as were the professionals.

The Court has a duty to insure an equitable distribution among like claims and sees no legitimate legal or business reason for classifying administrative claims at all, much less in a manner that sets two standards for payment—100% to the plan proponent and professionals who rendered services to the estate, expecting to be paid in full (and 100% to Council Oak in consideration for its withdrawal of its objection to Plan), and 50% to trade creditors and post-petition lenders, who also rendered valuable goods or services to the estate expecting to be paid in full. *See, e.g., Boston Post Road Ltd. Partnership v. FDIC (In re Boston Post Road Ltd. Partnership)*, 21 F.3d 477, (2d Cir.1994), *cert. denied*, 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995) (confirmation denied because there was no legitimate reason for separate classification of similar claims); *Windsor on the River Assoc. v. Balcor Real Estate Finance, Inc. (In re Windsor on the River Assoc.)*, 7 F.3d 127, 132 (8th Cir.1993) (one of the primary functions of bankruptcy law is to discourage "side dealing" between debtor and some creditors to the detriment of other credi-

While Dickerson cites cases for the proposition that administrative expense claims may be treated as a class in a plan, the cases cited do not specifically decide that issue. Dickerson's authorities merely illustrate that other plan proponents have placed administrative expenses claims in a class, which is not objectionable in and of itself if the administrative claims are paid in full.[3]

The Fourth Circuit Court of Appeals recognized that while a proponent may purport to classify priority administrative claimants, "priority ... claims are not designated as a 'class' within the definition of § 1123(a). . . . [T]he acceptance of a plan by priority tax claimants is not acceptance by a 'class' of impaired claims under § 1129(a)(19) for purposes of cram down." *Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 501 n. 8 (4th Cir.), *cert. denied*, 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *accord, In re Equitable Development Corp.*, 196 B.R. 889 (Bankr.S.D.Ala.1996).

In this case, the priority administrative claimants under Class 2 and Class 3 are entitled to be paid in full in cash on the effective date. Because the Plan provides for payment of only 50% of such claims and there is no evidence that each and every claimant under Class 2 and Class 3 has consented to such treatment, the Plan does not comply with Section 1129(a)(9)(A). Therefore the Plan cannot be confirmed.

Dickerson may amend the Plan to provide that priority administrative claims will be

paid in full. Renoticing and reballoting will not be necessary if such full payment will be accomplished through additional funding by Dickerson.[4] Those creditors who consent to less favorable treatment may be classified separately, and evidence of their consent must be presented to the Court to meet the burden of proving compliance with Section 1129(a)(9)(A).

## B. Non-debtor release.

### 1. Jurisdiction/Power.

While this Court has jurisdiction to determine confirmation of the Plan, the more difficult question is whether the Court has jurisdiction to incorporate into a confirmation order the Release, which affects creditors' and shareholders' state and federal causes of action against Dickerson, a non-debtor third party. Even if jurisdiction is present, under what authority does the Court have the power to enter such an order? The Ninth Circuit Court of Appeals succinctly summarized the twin inquiries in connection with non-debtor releases as follows:

> Subject matter jurisdiction and power are separate prerequisites to the court's capacity to act. Subject matter jurisdiction is the court's authority to entertain an action between the parties before it. Power under section 105 is the scope and forms of relief the court may order in an action in which it has jurisdiction.

*American Hardwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods,*

---

tors); *Olympia & York Fla. Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir.1990) (discretion of plan proponent to classify claims is limited by basic priority rights and cannot be used to manipulate class voting); *see also* 11 U.S.C. § 1122.

3. For example, the bankruptcy court in *In re Glade Springs, Inc.*, 77 B.R. 184 (Bankr. E.D.Tenn.1987), refused to confirm a plan in which there was *no provision* for the payment of the IRS's unsecured priority claim and other priority claims. The court did not require that the claims be placed into a class, however—the proponent merely had to show, as a prerequisite to confirmation, that the estate was administratively solvent, *i.e.*, that priority claims could and would be paid in full. The court further stated that "absent consent by the creditor," the priori-

ty claims must be "unimpaired by the plan." *Id.* at 196.

In other cases cited by Dickerson, priority claimants were indeed placed in a class, but the class was to be paid in full, rendering it unimpaired. In those cases, classification of administrative claimants did not violate Section 1129(a)(9) or prejudice the claimants, and such classification had no significance in terms of voting on a plan because the class was unimpaired. *See In re Sacred Heart Hospital*, 182 B.R. 413, 423 (Bankr.E.D.Pa.1995); *In re Resorts Int'l Inc.*, 145 B.R. 412, 429 (Bankr.D.N.J.1990).

4. To the extent that additional funds will be contributed by Dickerson, evidence regarding feasibility (that is—evidence of availability of cash to further fund the Plan) may be submitted by the Trustee by affidavit.

*Inc.),* 885 F.2d 621, 624 (9th Cir.1989) (citations omitted).

### a. History of non-debtor releases.

The seminal cases under the Bankruptcy Code concerning confirmation of plans that include provisions enjoining creditors from pursuing claims against non-debtor third parties were bankruptcies resulting from mass tort litigation concerning defective products. *See In re A.H. Robins Co.,* 880 F.2d 694 (4th Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989) (Dalkon shield); *MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89 (2d Cir.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) (asbestos). In these cases, claimants who were enjoined from pursuing tort claims against non-debtor insurance companies and other potentially liable parties were required to seek recovery from a settlement fund or trust created by the plan instead of from the non-parties (insurers and other potentially liable parties) who funded the plan. Moreover, they were entitled to recover one-hundred percent of their claims from the fund or trust once such claims were liquidated either by settlement or in a judicial proceeding. The claimants therefore were *not impaired* by the plan. The claimants were not prevented from litigating their claims or from being fully compensated; only the source of compensation was limited—the fund replaced the tortfeasor or insurer as defendants. This form of non-debtor release has been referred to as "channeling," as claimants are channeled to a fund or trust, and its salient feature is that it does *not* result in claimants holding claims against non-debtor third-parties being denied a right to recovery. The Court notes that in 1994, Congress expressly authorized these types of "non-debtor discharges" in connection with asbestos claims cases. *See* 11 U.S.C. § 524(g) and (h). Congress did not authorize "non-debtor discharges" generally however.

Many courts have confirmed plans or affirmed the confirmation of plans notwithstanding non-debtor release provisions, citing *Robins, Johns–Manville,* and/or the broad authority of Section 105 of the Bankruptcy Code. In fact, a line of jurisprudence has developed to justify imposing injunctions on by-standers to a bankruptcy who have claims against a person or entity that has come forward to rescue an otherwise unfeasible reorganization by contributing resources to the plan. The underlying premise is that the release of a third-party funder of a reorganization plan—which, when contained in the order confirming plan, constitutes an injunction prohibiting any future action against such third party—is an essential component of the reorganization. *See, e.g., Monarch Life Ins. Co. v. Ropes & Gray,* 65 F.3d 973, 979–80 (1st Cir.1995) ("in extraordinary circumstances, it has been held that a bankruptcy court can grant permanent injunctive relief essential to enable the formulation and confirmation of a reorganization plan if, for example, nondebtors who would otherwise contribute to funding the plan will not settle their mutual claims absent 'protection' from potential post-confirmation lawsuits arising from their prepetition relationship with the chapter 11 debtor"; also finding that the order confirming plan, which enjoined post-confirmation litigation against contributors to plan, was res judicata as to the jurisdiction and power of the bankruptcy court to enter such an order, so that such injunction could not later be collaterally attacked); *LTV Corp. v. Aetna Casualty and Surety Co. (In re Chateaugay Corp.),* 167 B.R. 776 (S.D.N.Y.1994) (and cases cited therein); *In re Trans World Airlines, Inc.,* 185 B.R. 302, 321–22 (Bankr.E.D.Mo.1995) (does not recite basis of jurisdiction to order release; relies upon § 105 powers).

Other courts have held that Section 105 is not broad enough to permit a bankruptcy court to permanently enjoin actions against non-debtors. *See Landsing Diversified Properties–II v. First Nat'l Bank & Trust Co. (In re Western Real Estate Fund, Inc.),* 922 F.2d 592, 600–01 (10th Cir.1990), *modified on other grounds sub nom. Abel v. West,* 932 F.2d 898 (10th Cir.1991); *In re American Hardwoods, Inc.,* 885 F.2d 621, 626 (9th Cir.1989) (finding the bankruptcy court had jurisdiction, but lacked power under § 105 or otherwise, to enter a permanent injunction preventing a creditor from enforcing a judgment against a non-debtor guarantor).

Other courts have refused to confirm plans that include non-debtor releases, citing Section 524(e) of the Bankruptcy Code. These courts reason that because Section 524(e) provides that a discharge of the debtor does not discharge any other person or entity, releases of non-debtors are prohibited. *See, e.g., Marine Midland Business Loans, Inc. v. Miami Trucolor Offset Service Co.*, 217 B.R. 341 (S.D.Fla.1998) (but if plan containing such release is *confirmed* and not appealed, an affected party may not collaterally attack the release); *In re Davis Broadcasting, Inc.*, 176 B.R. 290, 292 (M.D.Ga.1994); *In re Market Square Inn, Inc.*, 163 B.R. 64, 66 (Bankr.W.D.Pa.1994) (also concludes that bankruptcy court lacks jurisdiction to adjudicate claim between non-debtor and its claimants). *See also Western Real Estate Fund*, 922 F.2d at 600 (appellate court reversed and vacated bankruptcy court's injunction that prohibited attorney-plaintiff from pursuing third party non-debtor, who was co-defendant with debtor in suit for attorneys fees, for the collection of the portion of fees that the bankruptcy court disallowed as a claim against the estate, holding that a non-debtor third-party is not entitled to what amounts to a discharge under section 524(e) without assuming the burdens of a bankruptcy proceeding).

▬ This Court does not believe that Section 524(e) was intended to *prohibit* such releases. Rather, Section 524(e) was intended to insure that co-debtors or guarantors (who are not debtors in the bankruptcy case), and their property, are not *automatically* released from the debt or guaranty upon the discharge of a debtor, and that the rights of creditors are not impaired by the debtor's discharge. For example, in the case of a guaranty, the guarantor is not released upon the discharge of the debtor who is primarily liable on the debt; Section 524(e) preserves a creditor's right to pursue a guarantor notwithstanding the discharge of the debtor, which might be deemed a modification of the underlying debt without the creditor's consent, and which might otherwise release the guarantor under state law.

▬ While this Court does not believe that Section 524(e) expressly prohibits non-debtor

releases, the statute does not provide any authority for non-debtor releases either. However, the Court agrees with the Tenth Circuit in *Western Real Estate Fund* that Section 524(e) embodies an important *policy* of the Bankruptcy Code—that is, the protection of rights of creditors to pursue persons and entities who are jointly liable with a debtor who have not assumed the burdens of a debtor under the Bankruptcy Code. *See Western Real Estate Fund*, 922 F.2d at 600–01.

Finally, a number of courts hold that bankruptcy courts lack subject matter jurisdiction under the framework of 28 U.S.C. §§ 157 and 1334 to release non-debtors from their obligations to their creditors, notwithstanding the non-debtor's contribution to a successful reorganization. *See Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir.1995) (*see also* cases cited in footnotes 19 and 20 therein); *In re Elsinore Shore Associates*, 91 B.R. 238, 255 (Bankr.D.N.J.1988).

#### b. Jurisdiction.

▬ Federal courts are courts of limited subject matter jurisdiction. A federal court may adjudicate a case or controversy only if there is both constitutional authority and statutory authority for federal jurisdiction. *See Henry v. Office of Thrift Supervision*, 43 F.3d 507, 511 (10th Cir.1994); *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 5.1 at 217 (Little Brown ed.1989). The Constitution provides federal courts with authority to vindicate and enforce powers of the federal government, the United States Constitution, treaties, and laws of the United States; and to hear cases and controversies in which the United States is a party, admiralty and maritime cases, cases against foreign countries or their citizens, and cases and controversies between citizens of different states. Such powers are only exercisable by federal courts, however, if and when Congress confers jurisdiction upon the courts by statute. *See Henry*, 43 F.3d at 511. The presumption is *against* federal subject matter jurisdiction, and a person desiring to invoke jurisdiction of a federal court has the burden of demonstrating statutory authority for such jurisdiction. *Id., citing McNutt v.*

*General Motors Acceptance Corp.*, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936).

Statutory authority for subject matter jurisdiction in bankruptcy cases is set forth in 28 U.S.C. § 1334, which confers exclusive jurisdiction of *cases under* title 11, and non-exclusive jurisdiction of civil proceedings *arising under* title 11, or *arising in* or *related to* cases under title 11, and of all property of the debtor and property of the estate, upon district courts, which jurisdiction is subsequently referred to bankruptcy courts by order of the district courts pursuant to 28 U.S.C. § 157(a).

The cases or controversies that Dickerson seeks to be finally adjudicated by this Court by virtue of the Release are disputes between a non-debtor, Dickerson, and claimants against Dickerson who also happen to be creditors, interest holders or claimants of the Debtor, or any other party that would be bound upon confirmation of the Plan. These controversies are not "cases under" title 11, because neither Dickerson nor his claimants are debtors in bankruptcy. Controversies between Dickerson and his claimants do not "arise under" the Code because the controversies contemplated are not limited to causes of action under the Bankruptcy Code, such as avoidance actions.

It could be argued that because the claims sought to be released are potential civil proceedings against Dickerson, and because Dickerson is the Plan Proponent, such proceedings are "arising in" or "related to" a case under title 11. This is *only* true, however, because Dickerson has inserted the Release into the Plan. *See, e.g., Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 756 (5th Cir.1995) (bankruptcy court lacked jurisdiction to approve all terms of a global settlement agreement submitted to the court for approval by debtor and three non-debtors; court had "related to" jurisdiction over settlement and release of certain contract claims regarding insurance coverage between the debtor and a non-debtor because the outcome of the proceeding would affect the size of the estate (although other defects in procedure prevented approval of settlement because an injunction contained therein affected the rights of third parties without due process);

settlement and release of the tort claims asserted between and *among three non-debtors* who were parties to the settlement could not be approved because the tort claims were only before the court by virtue of their inclusion in the settlement agreement and the release of the tort claims could have no effect upon the estate).

If proceedings over which the Court has no independent jurisdiction could be metamorphisized into proceedings within the Court's jurisdiction by simply including their release in a proposed plan, this Court could acquire infinite jurisdiction. Dickerson could conceivably insert into the Plan a release of his personal tax liabilities or a release of his home mortgage, and claim that this Court has jurisdiction over disputes between himself and the taxing authorities or his mortgagee because the disputes are "related to" a chapter 11 case by virtue of the release appearing in a chapter 11 Plan.

Dickerson does not seek to go so far, however. He is only seeking to release liabilities that arose as a result of his participation in the affairs of the Debtor. These liabilities may be related to the Debtor, but they do not necessarily arise *in* the Debtor's chapter 11 *case* —they may be prepetition claims that are not related to Dickerson's conduct during or participation in the chapter 11 case.

The furthest reaching type of jurisdictional nexus requires the proceeding over which jurisdiction is sought to be "related to" the bankruptcy case. The almost-universally accepted definition of a "related to" proceeding is one in which the "outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984). The *Pacor* test for "related to" jurisdiction has been adopted by this Circuit in *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990); *accord, Personette v. Kennedy (In re Midgard Corp.)*, 204 B.R. 764, 771 (10th Cir. BAP 1997); and recognized by the United States Supreme Court in *Celotex Corp. v. Edwards*, 514 U.S. 300, 115 S.Ct. 1493, 1498–99, 131 L.Ed.2d 403 (1995).

 The objective of "related to" jurisdiction is—

> to encompass tort, contract, and other legal claims by and against the debtor, claims that, were it not for bankruptcy, would be ordinary stand-alone lawsuits between the debtor and others but that section 1334(b) allows to be forced into bankruptcy court so that all claims by and against the debtor can be determined in the same forum. A secondary purpose is to force into the bankruptcy court suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate. Once they are shoehorned into the bankruptcy court on the authority of section 1334(b), such suits can then be stayed by authority of section 105 of the Bankruptcy Code....

*Zerand–Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161–62 (7th Cir.1994) (citations omitted).

In *In re Arrowmill Development Corp.*, 211 B.R. 497 (Bankr.D.N.J.1997), the bankruptcy court found "related to" subject matter jurisdiction to enter a purported discharge of a non-debtor contributor to a plan because the plan required infusion of funds by the third party as well as an enforcement provision, which the court found to have a "direct financial effect on the assets of the estate as well as an effect on the allocation of assets among the creditors." *Id.* at 503. While the third-party funding would undoubtedly have an effect upon the estate, the actions over which this Court has jurisdictional concerns are those between the potential claimants and a non-debtor, the outcome of which would have no effect upon the estate.

 The Dickerson Release is essentially an injunction against post-confirmation proceedings against Dickerson—preventing claimants from pursuing their claims is equivalent to issuing a final adjudication of the merits of such claims in favor of Dickerson. *See, e.g., In re Western Real Estate*

*Fund*, 922 F.2d at 600. The "proceeding" that must be examined to determine whether it is "related to" the Debtor's chapter 11 case, therefore, is the potential post-confirmation proceeding against Dickerson by one of his claimants. In this context, the outcome of any post-petition litigation against Dickerson would not have an effect upon property of the estate or its administration. The Plan requires simultaneous funding and distribution to creditors upon the effective date. Once Dickerson has funded the Plan and all administrative claims and pre-petition creditors have been paid, the Court will no longer have any oversight of the operations of the Debtor. The administration of the estate will be complete. The post-confirmation success of Digital and Dickerson will inure to the benefit of Dickerson, as sole shareholder, and the Reorganized Debtor's post-confirmation constituents. Other than enforcing the discharge of the Debtor's pre-confirmation debts, neither Digital nor Dickerson are entitled to the protection of this Court after the Plan is consummated and payment of claims under the Plan is completed on the effective date. Therefore, enjoining claimants from commencing claims against Dickerson personally after consummation is not within the "related to" jurisdiction of this Court because such adjudication would not affect the estate.

In this context, the United States Supreme Court case of *Callaway v. Benton*, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553 (1949), deserves mention.[5] *Callaway* concerned a railroad reorganization under the Bankruptcy Act. One term of the confirmed plan gave the company that leased equipment to the debtor the choice of *either* selling all of its assets to the debtor on the specific terms set forth in the plan (*i.e.*, for bonds of the reorganized debtor) *or* allowing its lease to be rejected, in which case it could seek damages from the debtor (who would likely not be able to pay damages because it would not be able to operate without the equipment). *Id.* at 134, 69 S.Ct. 435. Under the applicable state law,

---

5. The Court credits professor Ralph Brubaker's scholarly article, *Nondebtor Releases and Injunctions in Chapter 11: Revisiting Jurisdictional Precepts and the Forgotten Calloway v. Benton Case*, 72 Am.Bankr.L.J. 1 (1998), with focusing the Court's attention upon this case. While the Court does not adopt Professor Brubaker's contentions and conclusions wholesale, his thoughtful and thorough analysis of the issue of nondebtor releases warrants acknowledgment.

a sale of all assets of a corporation required the unanimous consent of the shareholders. *Id.* at 136, 69 S.Ct. 435. The officers of the lessor, however, were of the opinion that a simple majority of the shareholders was sufficient and thus indicated an intent to sell the assets to the reorganized debtor. *Id.* at 135, 69 S.Ct. 435. Dissenting shareholders of the lessor filed an action in state court seeking to enjoin the officers from selling the assets in violation of the state corporate law requiring unanimous consent. *Id.* The debtor requested that the district (bankruptcy) court permanently enjoin the state court proceedings so that the assets could be sold to the debtor and the plan could be consummated. The district (bankruptcy) court entered a temporary restraining order staying the state court proceedings. Ignoring the district court order, the state court entered an order enjoining lessor's officers and directors from selling the lessor's assets to the debtor. *Id.* The district court then issued a permanent injunction restraining further prosecution of the state action and declared the state court's injunction null and void. *Id.* The Fifth Circuit Court of Appeals reversed and vacated the order enjoining the state court action. The United States Supreme Court affirmed the Circuit.

While the purchase of the assets was obviously critical to the consummation of the plan and the successful reorganization of the debtor, the Supreme Court held that the district (bankruptcy) court lacked jurisdiction to enjoin the lessor's dissenting shareholders from interfering with the desire of the majority shareholders to contribute to the success of the debtor's plan. *Id.* at 142, 69 S.Ct. 435. Such an action permanently deprived the

dissenting shareholders of substantive rights against the lessor. The lessor was not a debtor in bankruptcy, nor was its property subject to jurisdiction of the district court. "We conceive the jurisdiction asserted by the district court over a solvent lessor not in reorganization to be an extension of ... traditional powers not justified by any provisions of the Bankruptcy Act." *Id.* at 147, 69 S.Ct. 435. Moreover, the only claims over which the district court had jurisdiction or power to impair were claims against the debtor; it lacked jurisdiction to negatively impact claims made against a non-debtor, the lessor. By permanently enjoining the state court action, the bankruptcy court effectively denied all relief to the dissenting shareholders, who had no claim against the debtor. *Id.* at 150, 69 S.Ct. 435. "The district court did not merely postpone action which would have hindered the development of the plan [which it may do on a temporary basis under section 11(15) of the Act, now § 105 of the Bankruptcy Code]; it took to itself the decision of a question which the plan left open for decision elsewhere." *Id.*[6]

*Callaway's* relevance to this case is manifest and multifaceted: A permanent injunction prohibiting certain legal action against a non-debtor is a *final adjudication* of such anticipated legal action in favor of the non-debtor, and all jurisdictional and due process prerequisites for such a final adjudication must be satisfied. Further, persons and entities who have not subjected themselves and all their assets to the bankruptcy process have not earned the protection of the bankruptcy court's power to terminate claims by permanent injunction.[7] Finally, a court can-

---

**6.** Temporary injunctions, or stays, of litigation against non-debtors have been justified when the non-debtor's undivided attention is required in order to develop a plan for the debtor and the court finds that the active litigation is a distraction that prevents or impedes swift and effective reorganization. *See, e.g., Bill Roderick Distributing, Inc. v. A.J. Mackay Co. (In re A.J. Mackay Co.),* 50 B.R. 756, 762 (D.Utah 1985). Such a stay is imposed for the benefit of the debtor and the debtor's creditors, not for the benefit of the non-debtor. Such a stay merely *delays* the action against the non-debtor until the non-debtor's attention is no longer required; it does not extinguish the claim. A release, or permanent injunction, contained in a confirmed plan, however,

has the effect of a judgment—a judgment against the claimant and in favor of the non-debtor, accomplished without due process. Neither the non-debtor, nor the claimant, have *an opportunity* to present their claims or defenses to the court for determination by way of an adversary proceeding, which is required under Bankruptcy Rule 7001. *See Feld v. Zale,* 62 F.3d at 764–65 and cases cited therein.

**7.** *See In re A.J. Mackay Co.,* 50 B.R. at 761, where the district court determined that the bankruptcy court lacked jurisdiction to protect a third party from its creditors; "[t]he jurisdiction over a debtor and his property necessary to protect them from creditors can properly be invoked

not assume jurisdiction in order to enjoin actions to protect a third party who is capitalizing a plan, even though such an injunction appears to be a critical pre-requisite to the adoption of a successful plan.

This Court therefore finds that it lacks jurisdiction to entertain and enjoin actions between Dickerson and his claimants, even though all parties are otherwise before the Court in connection with this case.[8]

### c. Section 105 powers

 Even if no jurisdictional bar existed, this Court is not convinced that Section 105, or any other section of the Bankruptcy Code, grants the Court the power to permanently enjoin claims against third parties. Section 105 provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105 is a powers statute. Equitable powers conferred under Section 105 "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988). The provisions of the Bankruptcy Code render protection and relief to debtors and equal distribution of a debtor's property to its creditors within a class. The Code lacks specific authority to reward non-debtor third persons who contribute funding to a plan by discharging certain debts of the non-debtor. The Court may not use its equitable powers to create substantive rights, such as a non-debtor discharge, otherwise unavailable under the Bankruptcy Code. *See United States v. Sutton*, 786 F.2d 1305, 1307–08 (5th Cir. 1986).

### 2. Release by agreement

Having found that the Court does not have jurisdiction to *impose* a permanent injunction prohibiting claimants from pursuing recovery

from a non-debtor, the question becomes whether the parties (the non-debtor and his claimants) may obtain such a release by agreement, and if so, what constitutes an agreement. And if the parties have agreed to release a non-debtor, may the Court transform the agreement into a judgment by incorporating it into the confirmed plan?

### a. Consent

Dickerson contends that the Tenth Circuit's pronouncement in *In re Ruti–Sweetwater, Inc.*, 836 F.2d 1263 (10th Cir.1988), requires that the Court consider that all non-voting claimants have consented to the Release provision contained in the Plan.

 *In re Ruti–Sweetwater* notwithstanding, this Court agrees with the Bankruptcy Court in *In re Arrowmill Development Corp.*, in that in order for a claimant in a chapter 11 case to enter into a contract to release a non-debtor—

> it is not enough for a creditor to abstain from voting for a plan, or even to simply vote "yes" as to a plan.... "[A] creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings." Rather the "validity of the release ... hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." Thus, the court must ascertain whether the creditor unambiguously manifested assent to the release of the nondebtor from liability on its debt.

*Arrowmill*, 211 B.R. at 507 (citations omitted). *See also Feld v. Zale Corp. (In re Zale)*, 62 F.3d 746, 757 n. 26 (5th Cir.1995), *quoting with approval, Browning v. Navarro*, 743 F.2d 1069, 1076 n. 20 (5th Cir.1984) (a bankruptcy court "exceeds its power if it enters a consent decree to which there was not actual consent or which was contrary to

---

only by filing for bankruptcy." *Id.* The court further found that the plan could be modified to delete offending provision upon proper notice and absent prejudice to those who relied upon the provision.

8. Even if the Court assumed "related to" jurisdiction over such actions, all parties must con-

sent to a bankruptcy judge rather than an Article III judge entering judgment. *See* 28 U.S.C. § 157(c)(2). Without such consent, this Court's role is limited to proposing findings of fact and conclusions of law to the District Court. *Id.* § 157(c)(1).

the public interest or was the result of a jurisdictional defect"); *In re Specialty Equipment Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993). ("[A] consensual release does not inevitably bind individual creditors. It binds only those creditors voting in favor of the plan of reorganization.").

### b. Dickerson Release

The proposed release of Dickerson contained in the Plan is a final adjudication in favor of Dickerson of all claims any claimant has against Dickerson in connection with conduct related to Digital. For example, if a shareholder believed she had a valid securities fraud claim against Dickerson, under state or federal law, in connection with the pre-petition sale of shares of Digital, the Release would extinguish such shareholder's claim. As required by Section 1129, shareholders receive no distribution under the Plan from the funding proposed by Dickerson or from the Reorganized Debtor, nor does the proposed plan contain an alternative defendant (such as an estate or trust) to which to channel a shareholder claim.

■ From a contracts point of view, this Court finds that any agreement between Dickerson and a *shareholder* who holds a claim against Dickerson to release the claim as stated in the Plan lacks consideration. Dickerson has agreed to infuse funds to provide for the full payment of secured claims, partial payment of priority claims, minimal payment of unsecured claims, and no return to investors. It is clear that Digital's shareholders would obtain no benefit in exchange for a release of their claims that they would not receive if they did not release their claims. It is impossible to determine whether any other potential claimant receives a benefit in exchange for a release of its claim,

because the Plan does not identify actual or potential claimants, the nature of claims, or the value of such claims.[9] Further, there may be claimants who are not aware of the existence of their claims and therefore may not realize that their action, or lack of it, results in the release of such claims.

■ Further, the universal consent required by contracts law is lacking. The Release purports to release upon confirmation "all [c]laims or causes of action, whether known or unknown, asserted or unasserted, vested or contingent or otherwise" of "any person bound by this Plan." Plan at ¶.14. Many creditors and interest holders who would be "bound by the Plan" did not vote in favor of the Plan. Those creditors and interest holders did not unambiguously manifest consent to the Release, yet their claims would be extinguished by virtue of the terms of the Plan immediately upon confirmation.[10]

■ Even if voting for the Plan did create a valid contract between Dickerson and his claimants, *subject matter jurisdiction* may not be conferred upon this Court by agreement. *See Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Feld v. Zale Corp. (In re Zale)*, 62 F.3d 746, 754, 757 n. 26 (5th Cir.1995) (bankruptcy court cannot enlarge its jurisdiction for judicial economy or for the purpose of fostering agreements or settlements of controversies; a court exceeds its authority in entering consent orders the subject matter over which it lacks jurisdiction); *A.J. Mackay Co.*, 50 B.R. at 763 (same). An order confirming the Plan would constitute a permanent injunction terminating the potential claimants' actions against Dickerson, actions over which no separate basis for subject matter jurisdiction has been established.

9. The Release is arguably broader than the discharge an individual debtor could obtain upon confirmation of a chapter 11 plan. Section 1141(d)(2) excepts from discharge claims that are excepted from discharge under Section 523. The Release would enjoin all claims, even if such claims would be non-dischargeable if Dickerson were a debtor.

10. In *Specialty Equipment Cos.*, 3 F.3d 1043 (7th Cir.1993), the court found a release contained in a plan to be consensual because the release was

limited specifically to those who affirmatively voted for the plan. *Id.* at 1047. "As a consequence, a creditor who votes to reject the Plan or abstains from voting may still pursue any claims against third-party nondebtors." *Id.* Issues of power and jurisdiction to confirm the plan were not fully addressed by the court because (1) they were not properly raised by the appellant and (2) the court found that the appeal was mooted by the unstayed substantial consummation of the plan. *Id.* at 1047 and 1048 n. 5.

Further, although personal jurisdiction may be waived by failing to raise it (*see* Fed.R.Civ.P. 12(h); Fed.R.Bankr.P. 7012), the affected claimants who were served with the Plan were originally haled before this Court for the sole purpose of determining their claims against the Debtor, so they had no reasonable opportunity to object to this Court's jurisdiction over them in connection with their claims against Dickerson. And although personal jurisdiction and venue maybe conferred by contract, the Court finds that claimants who voted against the Plan and claimants who did not vote did *not* affirmatively agree to waive jurisdiction in connection with claims that, but for Dickerson's role as plan proponent, would be required to be tried in a state or federal court of general and established jurisdiction.

Finally, Dickerson has argued that if jurisdiction is lacking, a claimant may challenge this Court's jurisdiction to incorporate the Release into its order when the claimant later asserts his or her claim, and therefore a claimant over whom this Court lacks jurisdiction is not harmed by the confirmation of the Plan. While the Court is not presently confronted with that set of facts, and may not even be the court to whom such an argument would be made, the Court observes that there is a significant body of authority that holds that confirmation of a chapter 11 plan is *res judicata* on the issue of subject matter and personal jurisdiction regarding matters addressed in the plan. In *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 977 (1st Cir.1995), the Court of Appeals held that a non-debtor release contained in a plan could not be collaterally attacked on jurisdictional grounds, citing *Stoll v. Gottlieb*, 305 U.S. 165, 172, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938) for the proposition that "unless a party in interest objects, and appeals an erroneous ruling by the bankruptcy court that it had 'jurisdiction' to confirm terms of plan, the ruling is conclusive in subsequent proceedings." *See also Celotex Corp. v. Edwards*, 514 U.S. 300, 313, 115 S.Ct. 1493, 1501, 131 L.Ed.2d 403 (1995); *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n. 9, 102 S.Ct. 2099, 2103 n. 9, 72 L.Ed.2d 492 (1982); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1052–53 (5th Cir.1987); *Marine Midland Business Loans, Inc. v. Miami Trucolor Offset Service Co.*, 217 B.R. 341 (S.D.Fla.1998) (res judicata prevented creditor with notice of confirmation proceedings from collaterally attacking release provision on ground that bankruptcy court lacked jurisdiction to adjudicate and release creditor's claims against non-debtor guarantors); *In re Davis Broadcasting, Inc.*, 176 B.R. 290, 292 (M.D.Ga.1994); *Martin Marietta Corp. v. County of Madison (In re Penn–Dixie Industries, Inc.)*, 32 B.R. 173 (Bankr. S.D.N.Y.1983).

This Court is as eager as Dickerson and those supporting the Plan to confirm and consummate a plan that will result in a distribution that exceeds the distribution likely upon conversion and liquidation. Regretfully, this Court cannot, for the sake of convenience, extinguish claims against Dickerson by *purporting* to exercise jurisdiction that the Court knows or suspects it lacks. Again, although the Court cannot confirm the Plan as written, the Court would be pleased to entertain the confirmation of a similar plan which remedies the jurisdictional defects addressed in this Order[11] on an expedited basis without renoticing or reballoting, if appropriate in light of the modifications.

A Summary Order Denying Confirmation of Chapter 11 Plan (the "Summary Order") is entered contemporaneously with this Memorandum Opinion and Order. Dickerson shall mail a copy of the Summary Order to the matrix and interested parties advising that a copy of this Memorandum Opinion may be obtained upon request from the Clerk of the Court or from counsel for Dickerson.

**SO ORDERED.**

---

**11.** Because the Court lacks jurisdiction over the Release, it also lacks jurisdiction to retain post-confirmation jurisdiction to enforce the Release, as proposed by ¶ 9(H) of the Plan.