In re SUNFLOWER RACING,
INC., doing business as The
Woodlands, Debtor.

SUNFLOWER RACING, INC., doing business as The Woodlands, and Hollywood Park, Inc., Appellants,

v.

MID–CONTINENT RACING & GAMING CO. I; Mid–Continent Racing & Gaming Co. II; Mid–Continent Racing & Gaming Co. III; Bank Midwest, N.A.; and FCLT Loans, L.P., Appellees.

Civ. A. No. 98–2263–EEI.
Bankruptcy No. 96–21187–11.

United States District Court,
D. Kansas,
Kansas City Division.

Oct. 21, 1998.

See also 226 B.R. 665.

FCLT Loans, L.P., Kansas Racing & Gaming Commission, Chapter 7 Trustee.

## MEMORANDUM AND ORDER

O'CONNOR, Senior District Judge.

This matter is before the court on the appeal of Sunflower Racing, Inc. ("Sunflower") and Hollywood Park, Inc. ("HPI") of the bankruptcy court's denial of Sunflower's reorganization plan. The court heard oral argument on October 1, 1998. After careful consideration of the record on appeal, and the arguments and authorities presented by the parties in their briefs and at oral argument, the court is prepared to rule. For the reasons stated below, the court will affirm the bankruptcy court's April 8, 1998 judgment and order denying confirmation of Sunflower's reorganization plan.

### Factual Background

The following is a summary of the factual background of this case which is largely taken from Bankruptcy Judge Flannagan's April 8, 1998 Memorandum Opinion.

### A. The Parties.

The primary entities and individuals involved in Sunflower's proposed reorganization plan include:

*Sunflower Racing, Inc.* R.D. Hubbard and Richard J. Boushka formed Sunflower to own and operate The Woodlands, a dog and horse racing track. Mr. Hubbard owned 60 percent of Sunflower's stock and Mr. Boushka owned 40 percent. The Woodlands opened as a newly constructed racing facility in 1989 on 386 acres in western Wyandotte County, Kansas. The facility is approximately 15 miles from the center of Kansas City, Kansas, just across the river from metropolitan Kansas City, Missouri. The Woodlands apparently is the only racing complex in the United States featuring dual tracks—a dog racing track and grandstand adjacent to a horse racing track and grandstand. Bruce G. Rimbo is Sunflower's president and chief executive officer.

*Hollywood Park, Inc.* Hollywood Park is an Inglewood, California, corporation inter-

F. Stannard Lentz, John J. Cruciani, Lentz & Clark, P.A., Overland Park, KS, Jan M. Hamilton, Leon B. Graves, Hamilton, Peterson & Keeshan, Topeka, KS, for Sunflower Racing, Inc., Hollywood Park Inc.

Mark A. Shaiken, David L. Zeiler, Stinson, Mag & Fizzell, P.C., Thomas R. Franklin, Media/Professional Insurance, Inc., Thomas M. Franklin, Wehrman & Colantuono, L.L.C., Laurence M. Frazen, Bryan Cave L.L.P., Kansas City, MO, Dale L. Somers, Wright, Henson, Somers, Sebelius, Clark & Baker, L.L.P., Topeka, KS, for Mid–Continent Racing & Gaming Co. I, Mid–Continent Racing & Gaming II, Mid–Continent Racing & Gaming Co. III, Bank Midwest, N.A.,

ested in various gambling enterprises in the United States. Hollywood Park's stock is publicly traded over the counter and reported among the Wall Street Journal's NAS-DAQ Small–Cap Issues. R.D. Hubbard is chairman of the board of directors of Hollywood Park. In March 1994, R.D. Hubbard and Richard J. Boushka exchanged all of their stock in Sunflower for stock in Hollywood Park. This exchange made Sunflower the wholly-owned subsidiary of Hollywood Park. However, Hollywood Park is not a debtor in this bankruptcy case.

*TRAK East.* TRAK East stands for The Racing Association of Kansas East, a Kansas not-for-profit corporation. It qualifies as a charitable organization under section 503(b) of the Internal Revenue Code. TRAK East was organized to hold a racing "organization license" under Kansas racing statutes. Kansas passed the Pari–Mutuel Racing Act in 1988. The Act created the Kansas Racing and Gaming Commission to administer licensing of dog and horse racing facilities. *See* Kan. Stat. Ann. § 74–8801 et seq. The Kansas Racing and Gaming Commission granted TRAK East an organization license for pari-mutuel betting in 1988. Sunflower contracted with TRAK East to manage and operate a racing facility on TRAK East's behalf. This qualified Sunflower for a "facility owner and manager license." Accordingly, later that year, the Commission granted Sunflower a license to build, own, and operate The Woodlands.

*The Bank or Creditor Group.* Sunflower financed construction of The Woodlands through a five-member Bank Group that participated in lending it approximately $40 million. The Bank Group took as collateral a mortgage and security agreement, a construction loan agreement, and other documents dated October 11, 1988. These documents granted the Bank Group members mortgages of equal rank.

On or about March 23, 1994, when R.D. Hubbard[1] exchanged his Sunflower stock for Hollywood Park stock, Mr. Hubbard and Sunflower executed a subordination and amendment agreement in favor of the Bank Group. Pursuant to the subordination agreement, Hubbard agreed to subordinate his right to repayment by Sunflower to the Bank Group's right to repayment. Hubbard also assigned to the Bank Group his right to vote his subordinated claim in any Chapter 11 reorganization case Sunflower might file.

At the same time, Hollywood Park executed a pledge agreement in favor of the Bank Group which amended the original financing documents covering The Woodlands. Pursuant to the agreement, Hollywood Park pledged all of its right, title, and interest in its shares of Sunflower to the Bank Group as security for the repayment of funds advanced by the Bank Group to Sunflower.

On or about December 19, 1994, Hollywood Park and Sunflower executed a subordination agreement in favor of the Bank Group. Pursuant to the agreement, Hollywood Park agreed to subordinate its right to repayment by Sunflower to the Bank Group's right to repayment.

When Sunflower filed its bankruptcy petition, the Bank Group consisted of: (1) First Union National Bank of Florida, (2) Bank One Lexington, N.A., (3) Bank Midwest, N.A., (4) INTRUST Bank, N.A., and (5) FCLT Loans, L.P. Since the bankruptcy filing, First Union Bank of Florida, Bank One Lexington, N.A., and INTRUST Bank, N.A., have sold their claims to companies controlled by William M. Grace. These sales account for the mortgage holders now being called the "Creditor Group," rather than the Bank Group. The Creditor Group's combined claim is now valued at $29,811,873.32.

*William M. Grace.* William M. Grace is a gaming entrepreneur with an interest in a riverboat casino in St. Joseph, Missouri. He also has business ties to the Iowa Tribe of Kansas, which operates a casino on its reservation at White Cloud, Kansas, in the northeastern corner of Kansas. As mentioned, Mr. Grace purchased three claims from members of the Bank Group after Sunflower filed this case. To hold the purchased claims, he formed three Kansas corporations. Ultimately, those corporations were named

---

1. R.D. Hubbard is the chairman of the board of Hollywood Park and Sunflower, a significant shareholder of Hollywood Park, and a creditor of Sunflower.

Mid–Continent Racing and Gaming Company I, Mid–Continent Racing and Gaming Company II, and Mid–Continent Racing and Gaming Company III. Gaming I holds the claim of INTRUST Bank, N.A., Gaming II holds the claim of First Union National Bank of Florida, and Gaming III holds the claim of Bank One Kentucky, N.A., formerly Bank One Lexington, N .A. The Creditor Group, Class 1 in the plan, now consists of: (1) Bank Midwest, N.A., (2) FCLT Loans, L.P., (3) Gaming I, (4) Gaming II, and (5) Gaming III.

*Wyandotte Tribe of Oklahoma.* The Wyandotte Tribe of Oklahoma is a federally-recognized Indian tribe which occupies a 200–acre reservation in Wyandotte, Oklahoma, approximately 90 miles northeast of Tulsa. Chief Leaford Bearskin, the Tribe's leader, and his council have turned to the prospect of off-reservation Indian gaming as a possible source of revenue. Initially, the Tribe's off-reservation casino plans focused on land contiguous to the Tribe's sacred burial grounds located in the central business district of Kansas City, Kansas. The Secretary of Interior has held the cemetery in trust for the Tribe since the Wyandotte Treaty of January 1, 1855.[2] As might be expected, the City of Kansas City, Kansas, opposes a gambling casino in ·its central business district. The City has encouraged the Tribe to abandon its downtown casino plans in favor of a casino at The Woodlands.

To protect its national sovereignty, the Wyandotte Tribe of Oklahoma often conducts its business through a tribal corporation organized under the laws of the United States.

*Huron Gaming, L.P.* Huron Gaming, L.P., a Delaware limited partnership, is mentioned in the plan as having a role in the financing, construction, and operation of a casino at The Woodlands, should Sunflower's plan come to fruition. H.P. Kansas, Inc., a Delaware corporation, and NORAM, North American Sports Management, Inc., a Florida corporation, are the general partners of Huron Gaming, L.P. Hollywood Park, Inc., a Delaware corporation, and NORAM are limited partners of Huron Gaming, L.P. NORAM has a consulting agreement with the Wyandotte Tribe of Oklahoma to assist the Tribe in obtaining, designing, and developing a casino at The Woodlands.

## B. The Competition.

The Woodlands exceeded its earnings projections for its first 18 months of operation. Local competition for gambling revenue, however, intensified in the early 1990s. Casino-style gambling started to become widespread throughout the Midwest pursuant to the Indian Gaming Regulatory Act of 1988. In addition, in October 1992, the Kansas Lottery implemented Club Keno which increased the Lottery's revenues by more than $30 million and had an instant negative impact on the revenues of pari-mutuel racing at The Woodlands. Further, in 1994, the Kansas Supreme Court held that Kansas voters had cleared the way for state-operated Indian casinos when they approved the state-owned and operated lottery. The Kansas Legislature eventually approved compacts with the four Indian tribes in Kansas, all of whom have since opened casinos.

Riverboat gambling also provided competition for The Woodlands. In 1994, the Argosy and Harrah's opened riverboats in Kansas City, Missouri. The Argosy, located in Riverside, is within 15 miles of The Woodlands. Harrah's eventually added another riverboat to its complex and several other riverboats opened in Kansas City, including Sam's Town, the Hilton Flamingo, and Station Casino. Finally, the Frontier Casino in St. Joseph, Missouri, opened approximately 40 miles from The Woodlands. This left The Woodlands with more riverboat competition within a 40–mile radius than any other race track in America.

## C. Sunflower's Lobbying.

Sunflower officials decided·in 1993 that to be competitive, The Woodlands had to incorporate casino-style gaming with pari-mutuel racing. That year Sunflower sought a constitutional amendment in Kansas to allow privately-owned casinos at pari-mutuel tracks, but the amendment eventually failed in the

---

**2.** "'Trust land' or 'land in trust status' means land the title to which is held in trust by the United States for an individual Indian or a tribe." *See* 25 C.F.R. § 151.2(d).

Kansas House of Representatives. In 1994, Sunflower began working with the four Kansas Indian tribes to form a partnership to construct a large casino at The Woodlands, but that effort was eventually discontinued. In 1995, Sunflower worked with other pari-mutuel tracks in the state to amend the Kansas Lottery Act to permit placement of Lottery-owned slot machines at pari-mutuel tracks, but these efforts were unsuccessful. In 1996, Sunflower again attempted to win approval for slot machines under the Kansas Lottery Act, but this attempt also failed for lack of support. Next, Sunflower pushed a bill permitting lottery-style games, but not slot machines, at the track.. This bill also failed.

### D. Debtor's Bankruptcy Filing And Bankruptcy Court's Ruling On Confirmation Of Debtor's Reorganization Plan.

Given the environment of strong competition, Sunflower concluded in 1996 that it could no longer meet its overhead expenses and debt service for The Woodlands. Accordingly, Sunflower filed this Chapter 11 case on May 17, 1996. Hoping to bolster The Woodlands' revenues, the Creditor Group agreed to a cash collateral order allowing Sunflower to lobby once again for slot machines. *See* ROA No. 10. The cash collateral order fixed June 1, 1997, as the deadline for accomplishing this task. *See id.* Pursuant to 11 U.S.C. § 1121 and a number of orders of the bankruptcy court granting extensions, Debtor had the exclusive right to file a plan of reorganization on or before July 9, 1997. On July 9, 1997, the bankruptcy court entered an agreed order which granted Debtor until July 15, 1997, to file a plan of reorganization, granted Debtor the exclusive right to have the plan confirmed until September 14, 1997, and provided that if the Debtor modified its July 15 plan, the remaining exclusive periods would terminate immediately. Debtor filed its original plan of re-organization on July 15 and first amended plan on September 16, 1997.

On October 1, 1997, the Creditor Group filed a motion to permit approval of a disclosure statement and dissemination of its own plan for voting. On October 27, the bankruptcy court denied the Creditor Group's motion and set a confirmation hearing on Debtor's plan for December 18, 1997. On October 31, 1997, Debtor filed a second amended reorganization plan. The confirmation hearing later was reset for January 22, 1998. The secured creditor class, having elected section 1111(b)(2) treatment, voted against the plan. Sunflower requested cram down, *i.e.*, to force its reorganization plan on the secured creditor class. The bankruptcy court held a four-day contested confirmation hearing on Sunflower's plan beginning on January 22, 1998.

On April 8, 1998, Bankruptcy Judge Flannagan issued a Memorandum Opinion denying confirmation of Debtor's plan. In particular, Bankruptcy Judge Flannagan denied confirmation because "[t]he plan fails to satisfy the fair and equitable standards of § 1129(b); it fails to repay secured claims with a market rate of interest; it fails to meet the feasibility requirement of § 1129(a)(10); it fails to comply with the absolute priority rule or its new value corollary;" and it impermissibly attempts to terminate third-party contracts. *See In re Sunflower Racing, Inc.*, 219 B.R. 587, 590, 598 (Bankr.D.Kan.1998) (Flannagan, J.), ROA No. 99.[3]

### E. Valuation.

The testimony before the bankruptcy court reflected two values for The Woodlands. J. Russell Dillon, Sunflower's appraiser, valued the property at $7,545,000. Gerald R. Maier, the Creditor Group's appraiser, testified that the value of The Woodlands is $18,230,000. The bankruptcy court noted in its April 8 Opinion that it need not fix the property's

---

**3.** The bankruptcy court gave two additional reasons for not confirming the plan—failure to disclose fully the identity and affiliations of plan participants and failure to show that fees due the United States Trustee have been or will be paid—but the bankruptcy court later modified its ruling to remove these two additional reasons as grounds for its decision to deny confirmation. *See* 5/21/98 Order Denying Debtor's and Hollywood Park's Motion to Reconsider (ROA No. 108).

exact value and simply used a valuation range of $7,545,000 to $18,230,000.

### F. Classification of Claims.

Sunflower's plan is based on two time periods. The first period extends for 24 months (currently only 14 months) from the "Effective Date" of the plan to December 31, 1999, the "Implementation Date." The second period begins on the Implementation Date and extends for 84 months. The combined periods total 108 months. The plan creates five classes of claims and one class of interests. It treats the classes differently during the two time periods.

*Class 1 Claims (Allowed Secured Claims of Creditor Group)*

Class 1 contains the allowed secured claims of the five-member Creditor Group: Bank Midwest, N.A. ($744,441.28), FCLT Loans, L.P. ($3,722,206.40), Gaming I ($1,488,882.56), Gaming II ($20,099,914.57), and Gaming III ($3,722,206.40).[4] The plan would pay Class 1 $2.5 million on the Effective Date and thereafter $508,205.04 over the first 24 months at $21,175.21 per month—a total of $3,008,205.04 during the first 24 months. If The Woodlands were taken into trust by the twenty-fourth month, the class would become the beneficiary of a letter of credit for the amount of its allowed claim less the payments made during the first 24–month period. For example, if all the proposed payments were made during the first period and The Woodlands were taken into trust on December 31, 1999, the amount of the letter of credit would be $26,803,668.28 ($29,811,873.32 less $2,500,000.00 less $508,-205.04). Beginning in the twenty-fifth month, the plan would pay this class according to the following schedule of increasing payments:

| Payments | Amount of Monthly Payment | Total Payments |
| --- | --- | --- |
| Month 25–36 (month 1) | $ 50,000.00 | $ 600,000.00 |
| Month 37–48 | $100,000.00 | $1,200,000.00 |
| Month 49–60 | $208,333.33 | $2,500,000.00 |
| Month 61–72 | $333,333.33 | $4,000,000.00 |
| Month 73–84 | $416,666.67 | $5,000,000.00 |
| Month 85–96 | $500,000.00 | $6,000,000.00 |
| Month 97–108 (month 84) | $667,656.11 | $8,011,873.32 |

But the plan would deduct from these payments the monthly payments Sunflower would make in the initial 24 months after the Effective Date. Those payments total $508,-205.24. The deductions would conform to the following schedule: $100,000.00 in Months 25–36; $100,000.00 in Months 37–48; $100,-000.00 in Months 49–60; $100,000.00 in Months 61–72; and $108,205.24 in Months 73–84. Of course, these deductions affect the present value of the proposed stream of payments.

Class 1 has unanimously elected section 1111(b)(2) treatment; therefore, it holds an allowed claim of $29,811,873.32 secured by a lien on The Woodlands for the full amount of the allowed claim. This means that if Sunflower's plan were confirmed but subsequently failed, Class 1 would be entitled to any appreciation in the value of The Woodlands. Class 1 voted to reject the plan.

Class 1's interest in the estate's interest in the property is set out in the plan at $6,019,-425.46. Sunflower computes this value for its interest by deducting Wyandotte County's tax lien of $1,992,886.82 from the $7,545,-000.00 valuation of Mr. Dillon and adding $467,312.28 for the value of personal property not included in his valuation. Deducting the $1,992,886.82 tax lien from Mr. Maier's $18,230,000 value for The Woodlands, the

---

4. These numbers, taken from the proofs of claims filed by these creditors on July 11, 1997, total $29,777,651.21. When Sunflower filed its plan, it calculated the Creditor Group's total claim, including interest as of that time, at $29,811,-873.32.

Creditor Group would calculate its interest in the estate's interest at $16,237,113 .18.

### Class 2 Claims (Allowed Secured Tax Claim)

Class 2 contains the allowed secured claim of the Treasurer of Wyandotte County, Kansas, for $1,992,886.82. This claim is a first lien on The Woodlands. The bankruptcy court held that Class 2 is impaired, is entitled to vote, and has satisfied section 1129(a)(10) with its vote to accept the plan.

The plan would pay this class $19,928.87 interest per month from the Effective Date to the Implementation Date calculated at 12% per annum. On the Implementation Date, this class would receive $250,000 .00 against its $1,992,886.82 claim, and Sunflower would sign and deliver a three-year promissory note to the class. The note would bear interest at 12% per annum, would commence monthly payments 30 days after the Implementation Date, and would continue payments until the balance of the claim was paid in full. The Treasurer's lien on The Woodlands would be released on the Implementation Date and replaced by a letter of credit. Failure to deliver any payment within 30 days would be a default. Default would free the County to exercise its rights against the property or the letter of credit, depending on the timing of the default, without obtaining an order of the Bankruptcy Court.

### Class 3 Claims (Allowed Unsecured Claims of the Creditor Group)

Class 3 contains the allowed unsecured claims of the Creditor Group, Class 1. Since Class 1 elected under section 1111(b)(2), it has no unsecured deficiency claim to be treated in Class 3. Thus, the election has eliminated Class 3.

### Class 4 Claims (Allowed Unsecured Claims of General Creditors)

Class 4 contains the allowed unsecured claims of general creditors totaling $18,323,-476.51. It includes the following claims: Richard Boushka ($91,658.00)—voted to reject plan, R.D. Hubbard ($15,249,887.02)—Creditor Group voted on his behalf to reject plan, and Shook, Hardy, & Bacon, L.L.P. ($30,988.82)—voted to accept plan. This class would receive a pro rata distribution of 10% to each claim holder no sooner than the thirtieth month after the Implementation Date and no later than the eighty-fourth month thereafter. Accordingly, the class is impaired. The bankruptcy court held that class 4 rejected the plan even if the vote of the Creditor Group on behalf of R.D. Hubbard was not counted.[5] The bankruptcy court also held that by not paying this class in full, the plan triggers the absolute priority rule because it also permits Class 6 (Hollywood Park) to retain its stock interest in Sunflower. See 11 U.S.C. § 1129(b)(2)(B). Under the plan, R.D. Hubbard's subordination agreement in favor of the Creditor Group would be terminated as of the Effective Date. The bankruptcy court held that this attempt to terminate a third-party contract is beyond the power of Sunflower's plan.

### Class 5 Claims (Allowed Unsecured Claim of TRAK East)

Class 5 contains the allowed unsecured claim of TRAK East totaling $583,333.33. TRAK East holds the organization license for The Woodlands. The class is impaired and has voted to accept the plan. The plan would cure any arrearages for unpaid charitable contributions or other obligations due TRAK East. From the Effective Date through the Implementation Date, TRAK East would receive $3,007.11 per month. Each monthly payment would be credited against the obligation to TRAK East and no interest would accrue on its claim. On the Implementation Date, Sunflower would pay TRAK East $291,666.67. The balance of TRAK East's claim would be paid in full on or before the date 180 days after the Implementation Date.

The bankruptcy court held that TRAK East is not an "affiliate" under section 101(2)(D) and is not an "insider" under section 101(31)(E). Accordingly, the bankruptcy court stated that Class 5's vote to accept the plan is proper and, along with Class 2's vote, satisfies section 1129(a)(10).

---

**5.** The Creditor Group claimed the right to vote Hubbard's claim under assignment language in the subordination agreement Mr. Hubbard signed in 1994.

*Class 6 (Allowed Stock Interest of Hollywood Park, Inc.)*

Class 6 contains the allowed interest of Hollywood Park, the holder of 100 percent of the stock of Sunflower. Under the plan, Hollywood Park would retain its stock interest in Sunflower. Hollywood Park pledged this stock to the Creditor Group. The plan would terminate the pledge and subordination agreements Hollywood Park had executed in favor of the Creditor Group on the Effective Date. The bankruptcy court held that this attempt to terminate the pledge agreement is beyond the power of Sunflower's plan. This class is unimpaired because the plan does not alter its legal, equitable, and contractual rights. The class did not vote either to accept or reject the plan.

## G. Overview of the Plan.

From the Effective Date of the plan to the Implementation Date, December 31, 1999, Sunflower and the Wyandotte Tribe of Oklahoma would work to have the Secretary of the Interior take The Woodlands into trust for the Tribe under the Indian Gaming Regulatory Act. If this could be accomplished, the Tribe would purchase The Woodlands with a loan from Huron Gaming Co., an affiliate of Sunflower's. The Creditor Group's mortgage lien would have to be removed from The Woodlands before the Tribe could purchase it. To remove the lien, Huron Gaming Co. would deliver a letter of credit to the Creditor Group in the amount of its claim. This letter of credit would be substituted for the Creditor Group's collateral, and the mortgage lien would be released. The letter of credit would protect the Creditor Group during the seven years Sunflower would make deferred cash payments. If Sunflower were to default on the payments, the Creditor Group could draw on the letter of credit.

If the Tribe could get the Secretary of Interior to take The Woodlands into trust by the Implementation Date, the Tribe would then seek a compact with the Governor of Kansas permitting gaming at The Woodlands. The Kansas Legislature also would have to approve the compact. If the approvals could be obtained, Huron Gaming would lend the Tribe the money to buy the property and Huron Gaming would construct a bingo hall and casino at The Woodlands. The Tribe would then give a seven-year master lease to Huron Gaming, or its affiliate, covering that part of the property encompassing the bingo hall and casino. Huron Gaming would sublease the casino to the tribal corporation which would operate the casino. Huron Gaming would provide the Tribe with advice and assistance on equipping and furnishing the casino under a consulting agreement. This consulting agreement would also have to be approved by the National Gaming Commission, an agency with regulatory responsibility under the Indian Gaming Regulatory Act. Under the sublease, the Tribe would receive rent of 70 percent of the available distributable cash and Huron Gaming would receive 30 percent. Under a contract with the Tribe, Sunflower would continue to operate the dog and horse races and pari-mutuel gaming at The Woodlands. Sunflower would pay creditors with gaming revenues according to the terms of the plan, and Hollywood Park would make up any shortfalls of cash necessary to make plan payments.

### Standard of Review

Our standard of review in bankruptcy appeals is clear. The bankruptcy courts' legal conclusions are subject to *de novo* review by the district court. *See Broitman v. Kirkland (In re Kirkland)*, 86 F.3d 172, 174 (10th Cir.1996). We are bound, however, by the bankruptcy court's factual findings unless such findings are clearly erroneous. *See id.; In re Herd*, 840 F.2d 757, 759 (10th Cir.1988). "A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made." *Conoco, Inc. v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 959 (10th Cir.1996) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). We must accept "the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relation-

ship to the supportive evidentiary data." *Gillman v. Scientific Research Prods, Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555 (10th Cir.1995) (citation omitted). "On the mixed question of whether the facts satisfy the proper legal standard, we conduct a *de novo* review if the question primarily involves the consideration of legal principles and apply the clearly erroneous standard if the question is primarily a factual inquiry." *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 572 (10th Cir.) (citation omitted), *cert. denied*, 502 U.S. 983, 112 S.Ct. 589, 116 L.Ed.2d 614 (1991). Not surprisingly, Appellants contend that this appeal involves primarily questions of law, while Appellees contend that this appeal involves primarily issues of fact. The court will briefly address the applicable standard of review in each section of this order.

### Analysis

■ A bankruptcy court must confirm reorganization plans if and only if all thirteen requirements of section 1129(a) of the Bankruptcy Code are satisfied. *See* 11 U.S.C. § 1129(a)(1)-(13); *Matter of 203 N. LaSalle St. Partnership*, 126 F.3d 955, 960 (7th Cir. 1997), *cert. granted*, ―― U.S. ――, 118 S.Ct. 1674, 140 L.Ed.2d 812 (1998). One of these requirements, *i.e.*, the unanimous acceptance of the plan by impaired classes, 11 U.S.C. § 1129(a)(8), does not have to be met if the plan does not discriminate unfairly and is "fair and equitable" with respect to each impaired class of claims that has voted to reject the plan. *See* 11 U.S.C. § 1129(b)(1); *In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985). The Bankruptcy Code sets forth three factors for a bankruptcy court to consider when determining whether a reorganization plan is fair and equitable to a dissenting class of secured claimants. These factors include:

(A) With respect to a class of secured claims, the plan provides—

(i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2).

### I. Scope Of Appeal.

■ The Creditor Group first argues that Appellants have not properly appealed the bankruptcy court's order denying confirmation of Sunflower's reorganization plan entered on April 8, 1998. In the Notice of Appeal, Appellants state that they are appealing the bankruptcy court's final order denying their motion to reconsider entered on May 21, 1998. The Creditor Group points out that an appeal of a reconsideration order does not constitute an appeal of the underlying judgment. Nevertheless, an appeal of an order denying a motion to reconsider is sufficient to allow the appellate court to consider the merits of the underlying order "if the appeal is 'otherwise proper, the intent to appeal from the final judgment is clear, and the opposing party was not misled or prejudiced.'" *Artes–Roy v. City of Aspen*, 31 F.3d 958, 961 n. 5 (10th Cir.1994) (quoting *Grubb v. Federal Deposit Ins. Corp.*, 868 F.2d 1151, 1154 n. 4 (10th Cir.1989)); *see United States v. Louisiana Pacific Corp.*, 106 F.3d 345, 346 n. 1 (10th Cir.1997). The Creditor Group has offered no argument on these points, apparently conceding that this appeal is otherwise proper, that Appellants' intent to appeal the underlying denial of plan confirmation was clear, and that the Creditor Group was not misled or prejudiced. Indeed, Appellants' Docketing Statement clearly sets forth the nature of the case or proceeding

from which this appeal arises as the "Bankruptcy Court's denial of confirmation of Debtor's Second Amended Plan of Reorganization." ROA No. 114. In these circumstances, the court will treat the appeal of the bankruptcy court's reconsideration order as an appeal of the underlying judgment and order denying plan confirmation entered on April 8, 1998.

## II. Appropriate Interest Rate For Present Value Calculation.

 The Bankruptcy Code requires that with respect to a class of secured claims which opposes a plan, the plan must provide that the holders of such claims receive on account of their claims deferred cash payments totaling at least the allowed amount of their claims. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II). The Bankruptcy Code further provides that the present value of the deferred cash payments as of the effective date of the plan must total "at least the value of such holder's interest in the estate's interest in such property." *Id.* The bankruptcy court's finding as to the appropriate discount rate to use for the present value calculation generally is reviewed under the clearly erroneous standard. *See Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII),* 961 F.2d 496, 500 n. 5 (4th Cir.1992) (citing *In re Camino Real Landscape Maintenance Contractors, Inc.,* 818 F.2d 1503, 1505 (9th Cir.1987)), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). In the instant action, however, we will review the bankruptcy court's finding de novo because it primarily involves interpretation of legal principles, *e.g.,* whether a contract rate or market rate of interest must be used. *See Uselton,* 940 F.2d at 572.

Debtor claims that Class 1's interest in the estate's interest in the property is $6,019,-425.46 ($7,545,000.00—$1,992,886.82, County's tax lien, + $467,312.28, value of personal property not included in appraisal). The Creditor Group claims that its interest in the estate's interest of the property is $16,237,-113.18 ($18,230,000—$1,992,886.82, County's tax lien). As noted previously, the bankruptcy court did not adopt a specific valuation of Class 1's interest for purposes of its analysis. Under the plan, Debtor calculated the present value of all of its payments at $19,514,-667.42 based on the "contract" rate of interest of 7.22%, compounded monthly.

 The bankruptcy court noted two problems with using 7.22% as the discount factor in the present value analysis: (1) the actual contract rate of interest on the date of the confirmation hearing was 7.36%, and (2) a market rate of interest on loans with similar risk to that being forced on the creditors should be used. With respect to the bankruptcy court's first conclusion, we agree that the 7.22% rate proposed in the plan (termed as the "contract" rate of interest) was inappropriate. The contract rate of interest was a variable rate calculated quarterly using the London Interbank Offered Rate ("LIBOR") plus 1.75%. *See* ROA No. 93 at 68 (testimony of Bruce Rimbo). The bankruptcy court's concern over the higher contract rate as of the confirmation hearing (7.36%) illustrates why variable contract rates are not appropriate for a present value analysis. In essence, Debtor seeks under the plan to convert its current loan from a variable rate to a fixed rate (as of October 31, 1997) with no evidence as to the relationship between fixed and variable rate loans. Debtor ignores that fixed rate loans typically are higher than variable rate loans. *See In re Montgomery Court Apts.,* 141 B.R. 324, 342 (Bankr.S.D.Ohio 1992) (adopting expert testimony that 1.92% premium is normally charged by banks to reflect increased risk imposed by elimination of the variable rate). Debtor did not present any evidence as to the premium, or lack thereof, charged on fixed rate loans versus variable rate loans. In these circumstances, the bankruptcy court simply could not use the suggested rate by the Debtor to calculate the present value of its payments because it was not a fixed rate. *See United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1286 (8th Cir.1986) (noting that the Bankruptcy Code "contemplates the use of a fixed interest rate" and that use of floating rate would be administratively difficult and "would complicate a determination of the feasibility of the debtor's reorganization plan"); *In re Claeys,* 81 B.R. 985, 994 (Bankr.D.N.D.1987) (noting that present value calculation cannot

be made based on a variable discount rate); *In re Lewis Indus.*, 75 B.R. 862, 870 (Bankr. D.Mont.1987) (finding that a fixed rate is mandated by the Bankruptcy Code in computing the present value of future payments); *In re Fisher*, 29 B.R. 542, 551–52 (Bankr. D.Kan.1983) (Pusateri, J.) (rejecting variable rate in Chapter 13 present value calculation). Under the proposed plan, the Creditor Group essentially would be forced to accept a loan below both the contract and market rates of interest.

With respect to the bankruptcy court's second conclusion—that a market rate of interest should be used, we need not reach the issue given that the "contract" rate proposed by the Debtor lacks factual support, as discussed above. The bankruptcy court relied in part on *Hardzog v. Federal Land Bank (In re Hardzog)*, 901 F.2d 858 (10th Cir. 1990). In *Hardzog*, the Tenth Circuit held that "in the absence of special circumstances, such as the market rate being higher than the contract rate, Bankruptcy Courts should use the current market rate of interest used for similar loans in the region." At least two bankruptcy courts within the Tenth Circuit have interpreted *Hardzog* to mean that the contract rate should be used if it is lower than the market rate, and that the contract rate "serves as a sort of ceiling for the capitalization rate in a cram down situation." *In re Oglesby*, 221 B.R. 515, 520 n. 5 (Bankr. D.Colo.1998); *see In re Segura*, 218 B.R. 166, 173 (Bankr.N.D.Okla.1998) ("The Tenth Circuit, therefore, capped the cramdown interest rate at the contract rate."). *But see In re Smith*, 192 B.R. 563, 566–68 (Bankr. W.D.Okla.1996) (questioning whether contract rate must be used as a cap where the creditor is undersecured); *General Motors Acceptance Corp. v. Jones*, 999 F.2d 63, 71 n. 11 (3d Cir.1993) (contract rate should not be used as a cap). Even if we accept the rationale of the courts in *Oglesby* and *Segura*, however, the "Ceiling" proposed by the Debtor is inappropriate for present value calculations because it is based on the variable contract rate as of October 31, 1997. Accordingly, the bankruptcy court correctly held that a market rate should be used, the only other option presented at trial, given the variable contract rate proposed by the Appel-

lants. We note that if Appellants had presented some evidence as to the premium for a fixed rate loan versus a variable rate loan, then use of the "contract" rate plus this premium may have been appropriate.

In sum, the fixed "contract" rate of interest proposed by Sunflower in its plan (1) does not even provide the Creditor Group with the actual contract rate of interest (7.36% on the date of trial) and (2) is not actually the contract rate of interest because the contract provides for a variable rate. Accordingly, the bankruptcy court's conclusion that the rate of interest proposed in the plan is not appropriate will not be disturbed.

## III. Plan Sale.

The bankruptcy court discussed in its April 8 Order whether Sunflower's plan was fair and equitable under 11 U.S.C. § 1129(b)(2)(A)(ii). As part of that discussion, the bankruptcy court observed that the transactions in the proposed plan may constitute "lien stripping" under *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). *See Sunflower*, 219 B.R. at 601 n. 30. The bankruptcy court concluded, however, that it need not make its reasoning on these points grounds for its decision because "the plan fails on more fundamental grounds." *See id.* at 601. Moreover, Appellants do not claim that the proposed plan meets the plan sale requirements of section 1129(b)(2)(A)(ii). For the above reasons, we need not address the requirements of section 1129(b)(2)(A)(ii).

## IV. Indubitable Equivalent Of Secured Claims.

■ The next standard for determining whether a plan is fair and equitable is the indubitable equivalent standard. *See* 11 U.S.C. § 1129(b)(2)(A)(iii). For a class of secured claims, as held by the Creditor Group, the plan must provide for the realization by the Creditor Group of the "indubitable equivalent" of its claims. As noted previously, the Creditor Group has made the section 1111(b)(2) election so the amount of the Creditor Group's secured claim is approximately $29.3 million.

■ The bankruptcy court's determination of whether the Creditor Group receives the indubitable equivalent of its secured claims under the plan is a mixed question of law and fact. *See Arnold & Baker Farms v. United States (In re Arnold & Baker Farms),* 85 F.3d 1415, 1421 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997). Although the underlying facts for such a determination are reviewed under the clearly erroneous standard, "the ultimate conclusion of indubitable equivalence is a question of law which we review de novo because it requires analysis of the meaning of the statutory language in the context of the Bankruptcy Code's 'cram down' scheme." *Id.* (citing *Woods v. Pine Mountain, Ltd. (In re Pine Mountain, Ltd.),* 80 B.R. 171, 172 (9th Cir. BAP 1987)). *But see In re James Wilson Assocs.,* 965 F.2d 160, 172 (7th Cir.1992) (reviewing indubitable equivalence determination under clearly erroneous standard).

Under the plan, the Creditor Group would receive a letter of credit on the Implementation Date of the plan (not later than December 31, 1999). Hollywood Park presented testimony to the bankruptcy court demonstrating that Hollywood Park qualified for an immediate letter of credit sufficient to cover the Creditor Group's claim. Hollywood Park has made no enforceable commitment, however, to provide the letter of credit either now or at the Implementation Date. As the bankruptcy court noted, Hollywood Park's ability to obtain a letter of credit may be significantly different nearly two years after the effective date of the plan. *See Sunflower,* 219 B.R. at 602.

In addition to the above concerns, the bankruptcy court noted that it could not determine whether the letter of credit proposed under the plan was the indubitable equivalent of the Creditor Group's secured claims without any enforceable commitment by the parties as to the specific terms of such a letter of credit. We fully agree with the bankruptcy court's statements in this regard—

Letters of credit are not generic. They may be revocable by the issuer, transferable by the beneficiary, and confirmable by another bank. And they may be general or special in designating a beneficiary and limited in their duration. No doubt some contain other qualifications as well.

Litigation to enforce letters of credit is not unheard of. No prudent lawyer would counsel his client to accept a letter of credit without knowing its specific terms. If the Creditor Group had thoughts of accepting Sunflower's plan, it would have wanted answers to numerous questions before it voted to accept a letter of credit for its liens. *Likewise, the Court would want those same answers before it could decide to force a letter of credit on the Creditor Group.*

*Sunflower,* 219 B.R. at 601 (emphasis added).

■ In sum, Appellants have failed to show that if a letter of credit is issued under the plan, such a letter of credit would be the indubitable equivalent of the Creditor Group's secured claims. Given the lack of an enforceable commitment by Hollywood Park to provide the letter of credit in the future coupled with the absence of plan provisions discussing the specifics of the letter of credit, we agree with the bankruptcy court that Sunflower's plan does not provide for the realization of the indubitable equivalent of the Creditor Group's secured claims.

## V. Fair And Equitable.

■ The determination of whether a deferred payment plan is fair and equitable is a factual question which is reviewed under the clearly erroneous standard of review. *See Citibank, N.A. v. Baer,* 651 F.2d 1341, 1346 (10th Cir.1980); *Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174, 1176–77 (9th Cir.1992); *Affiliated Nat'l Bank—Englewood v. TMA Assocs., Ltd. (In re TMA Assocs., Ltd.),* 160 B.R. 172, 177 (D.Colo. 1993). The bankruptcy court correctly noted that section 1129(b)(2) sets forth only minimum standards of what is fair and equitable. *See Sunflower,* 219 B.R. at 603 (citing *Federal Savings & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr., Inc.),* 865 F.2d 673, 675 (5th Cir.1989)); *In re Montgomery Court Apts.,* 141 B.R. at 346. "A court must consider the entire plan in the context of the rights of the creditors under

state law and the particular facts and circumstances when determining whether a plan is 'fair and equitable.' " *See In re D & F Constr., Inc.*, 865 F.2d at 675.

Before examining the bankruptcy court's opinion, we briefly examine the impact of a secured creditor's election under section 1111(b) of the Bankruptcy Code. Under that section, a class of secured creditors can elect to have their entire claim treated as a secured claim so that they retain a lien on the debtor's property for the full amount of their claim (here, $29.3 million). *See* 11 U.S.C. § 1111(b)(2). This election protects the secured creditors from a debtor selling the property without fully satisfying the secured obligation. If the § 1111(b) election is made and deferred payments are proposed, then the total payments on the secured claim must at least equal the value of the secured claim. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II). In addition, if the election is made, the present value of the payments to the secured creditor must equal at least the value of the collateral as of the effective date of the plan. *See id.; In re Griffiths*, 27 B.R. 873, 876 (Bankr.D.Kan. 1983) (Pusateri, J.). If a class of secured creditors does not make the section 1111(b) election, then the class retains a lien on the property not to exceed the value of the property as of the effective date of the plan. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(I) (in the instant action, the value of such a lien would be approximately $6 million). The secured creditor is entitled to receive deferred cash payments totaling at least the allowed amount of the secured claim, which is limited by the value of the collateral. *See* 11 U.S.C. § 1129(b)(2)(A)(i)(II). Any amount of the secured creditor's claim which exceeds the value of the collateral is treated as an unsecured claim and must be paid in accordance with section 1129(b)(2)(B) of the Bankruptcy Code.

Here, the bankruptcy court held that the plan's payment schedule was not fair and equitable even though the plan appears to provide for payments with a present value greater than the value of the collateral held by the Creditor Group ($6,019,425.46) on the

effective date of the plan.[6] The bankruptcy court noted that the Creditor Group would not receive principal repayment on that part of the debt covering the $6,019,425.46 value of The Woodlands for the first several years of the plan. After deducting the $2.5 million cash payment on the effective date of the plan, the Creditor Group is entitled to receive payments with a present value greater than $3,519,425.46 under the Bankruptcy Code. The bankruptcy court found that if payments to liquidate the $3,519,425.46 claim were amortized equally over the 9 year plan period, assuming a 7.22% interest rate, then the monthly payment would have been $44,-408.10 ($23,232.89—principal, $21,175.21—interest). The plan proposes payments to the Creditor Group of $21,175.21 per month during the initial 24 month period. In effect, no principal payments are made during the initial 24 month period.

■■■■ The bankruptcy court held that the back-end loaded payment plan proposed by Appellants is similar to a negative amortization plan. *See Sunflower*, 219 B.R. at 603 (noting that the plan "exemplifies" negative amortization). In particular, the bankruptcy court found that the principle of negative amortization applies when either principal or interest is being deferred. *See id.* Bankruptcy courts typically view negative amortization plans as highly suspect and accordingly rarely confirm such plans. *See, e.g., id.; In re M & S Assocs., Ltd.*, 138 B.R. 845, 850 (Bankr.W.D.Tex.1992); *In re Apple Tree Partners*, 131 B.R. 380, 395 (Bankr. W.D.Tenn.1991); *In re Club Assocs.*, 107 B.R. 385, 398 (Bankr.N.D.Ga.1989), *aff'd*, 956 F.2d 1065 (11th Cir.1992). Courts apply a ten-factor test to determine whether a negative amortization plan is fair and equitable. These factors include:

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

6. As explained previously, the bankruptcy court also held that Appellants' present value calcula-

tion is flawed because it used 7.22% discount rate, not a market rate of interest.

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.

*Great Western Bank,* 953 F.2d at 1178 (quoting *In re Apple Tree Partners,* 131 B.R. at 398). Here, the bankruptcy court, although not specifically referring to this ten-factor test, found that several of these factors weighed against confirmation of the instant plan. In particular, the bankruptcy court held that the plan does not offer a market rate of interest, the amount and length of the proposed deferral of payments are unreasonable, the debtor's financial projections were not sufficiently proven, the plan unduly shifts the risks to the Creditor Group, the plan precludes the secured creditors' foreclosure, and there are not adequate safeguards to protect the Creditor Group against plan failure. *See Sunflower,* 219 B.R. at 603–04. We find that none of these findings are clearly erroneous based on the record evidence. Accordingly, the bankruptcy court's finding that the plan is not fair and equitable is well supported.

Appellants argue that the bankruptcy court's comparison of the plan's provisions to a negative amortization plan was inappropriate because no interest accrues on the Creditor Group's secured claim of $29.3 million because the Creditor Group made the section 1111(b)(2) election.[7] Even with that election,

however, the present value of the payments as of the effective date of the plan must total at least the value of the Creditor Group's interest in Sunflower's interest in The Woodlands, which is $6,019,425.46 according to the Appellants. Sunflower could satisfy this requirement by paying the entire $6,019,425.46 on the effective date of the plan or by paying a portion of the $6,019,425.46 over time. If Sunflower proposes to pay a portion of the $6,019,425.46 over time, such future payments must be reduced to present value based on an appropriate discount (interest) rate. Accordingly, interest does accrue "in a sense" on the unpaid amount of the $6,019,425.46 value of the Woodlands. The bankruptcy court similarly stated:

> If deferred cash payments are proposed where the § 1111(b)(2) election applies, the Court cannot confirm the plan unless the payments total at least the allowed amount of the claim and have a present value, as of the effective date, of at least the amount of the claim holder's interest in the estate's interest in property. This present value idea means the claim must repay both principal and interest over time if it is to be judged fair and equitable.

*Sunflower,* 219 B.R. at 603.

For all of the above reasons, we find that the bankruptcy court's conclusion that the plan is not fair and equitable is not clearly erroneous.

## VI. Feasibility.

The feasibility of a plan is a factual question subject to the clearly erroneous standard of review. *See, e.g., Financial Sec. Assurance, Inc. v. T–H New Orleans Ltd. Partnership (In re T–H New Orleans Ltd. Partnership),* 116 F.3d 790, 801 (5th Cir. 1997); *Abele v. Webb (In re Webb),* 932 F.2d 155, 158 (2d Cir.1991); *In re TMA Assocs.,* 160 B.R. at 175. The test for feasibility is whether the plan is "likely to be followed by the liquidation, or the need for further finan-

7. On the other hand, the Creditor Group argues that the bankruptcy court considered the fairness of Sunflower's plan in part by determining what amount the Creditor Group would have received if they had not made the section 1111(b)(2) election. While a similar analysis would be appropriate to evaluate such a hypothetical, we believe the bankruptcy court limited its analysis to a determination of whether the manner in which the plan provided for the present value of the Creditor Group's interest in the collateral ($6,019,425.46) was fair and equitable.

cial reorganization of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). In determining the feasibility of a plan, the bankruptcy court must "scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *Prudential Ins. Co. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1341 (8th Cir.1985) (quoting *United Properties, Inc. v. Emporium Dept. Stores, Inc.*, 379 F.2d 55, 64 (8th Cir.1967)); *see In re Pikes Peak Water Co.*, 779 F.2d 1456, 1460 (10th Cir.1985).

While deferred payment plans are not considered infeasible per se, such plans are subject to close scrutiny, particularly where the time period for payments is nearly ten years. Chief Bankruptcy Judge Pusateri has stated:

> While this Court has noted that nothing in § 1129(b)(2)(A) prohibits long term payouts, nonetheless there is a type of sliding scale in operation. In general, proof of feasibility is an easier task when payouts are done over shorter periods of time. The longer a debtor proposes a payout, the more difficult it may become to prove distant future ability to service debts.

*In re White*, 36 B.R. 199, 205 (Bankr.D.Kan. 1983). In the instant action, the bankruptcy court held that there are simply too many uncertain events which must occur before Sunflower's plan can be successful. *See Sunflower*, 219 B.R. at 604. A few of the plan contingencies include: (1) the Secretary of Interior would have to take The Woodlands into trust, (2) Huron Gaming (or Hollywood Park or some affiliate) must lend the Wyandotte Tribe the purchase price, and (3) the Creditor Group's liens on The Woodlands must be cleared. *See id.* Based on the record evidence, the court concludes that the bankruptcy court's conclusion that the plan is infeasible is not clearly erroneous.

Appellants primarily argue that the bankruptcy court ignored that if the transaction with the Wyandotte Tribe is never completed and a letter of credit is not issued, then the Creditor Group can retake the property as of December 31, 1999. Appellants are correct that the bankruptcy court did not include this part of the plan in its analysis of the plan's feasibility. The feasibility of a plan, however, is not judged solely by whether creditors can regain the collateral in the event the plan fails. Appellants apparently recognize this point and acknowledge that they are required to show a reasonable assurance of commercial viability based on the proposed transaction with the Wyandotte Tribe. Nothing in the bankruptcy court's opinion suggests that Appellants were held to any higher standard. In any event, Appellants did not offer any evidence at trial as to the value of The Woodlands on December 31, 1999 if the transaction with the Wyandotte Tribe was not completed. *See, e.g.,* ROA No. 94 at 298–300 (testimony of Bruce Rimbo). Without any such evidence, the bankruptcy court correctly judged the feasibility of the plan based on the probability of success of the transaction with the Wyandotte Tribe.

## VII. Absolute Priority Rule—New Value Corollary.

We will review de novo the bankruptcy court's legal conclusion as to the applicability of the absolute priority rule and its new value corollary. *See In re Kirkland*, 86 F.3d at 174. Pursuant to 11 U.S.C. § 1129(b)(2)(B), a class of equity cannot receive or retain any property on account of its interest unless unsecured creditors either accept the plan or are paid in full with interest. Some courts have created an exception or corollary to this rule where a class of equity is permitted to retain or receive property under a plan even if unsecured creditors are not paid in full if the class of equity contributes "new value" to the debtor. *See, e.g., In re Drimmel*, 108 B.R. 284, 288 (Bankr.D.Kan. 1989), *aff'd*, 135 B.R. 410 (D.Kan.1991), *aff'd sub nom., Unruh v. Rushville State Bank*, 987 F.2d 1506 (10th Cir.1993). Here, the bankruptcy court ruled that the plan violates the absolute priority rule because class 4 (unsecured general creditors) is not paid in full while class 6 (Hollywood Park) retains its stock interest in Sunflower. *See Sunflower*, 219 B.R. at 605. The bankruptcy court also held that the new value exception or corollary is inapplicable because Hollywood Park

is not contributing new value that is reasonably equivalent to Hollywood Park's retained interest in the Debtor. *See id.*

Hollywood Park owns 100% of the outstanding shares in the Debtor and the plan proposes that Hollywood Park would retain that interest in the reorganized Debtor. Hollywood Park would loan Sunflower $2.5 million (for Sunflower to use for the initial loan reduction) and issue a guarantee of the $508,205.04 of interest payments Sunflower would make during the first two years of the plan. The bankruptcy court held that the total amount of Hollywood Park's investment (loan), approximately $3 million, is not reasonably equivalent to its retained interest in The Woodlands (valued at least at $6,019,-425.46 after subtracting the tax lien on the property). *See id.*

■ The Tenth Circuit has specifically declined to address whether the new value corollary or exception continues to apply within the Circuit. *See Unruh,* 987 F.2d at 1510. We will assume that the new value corollary exists for purposes of our analysis. Under the new value corollary to the absolute priority rule, a junior interest holder can retain its interest or control in the debtor if the junior interest holder makes new contributions to the debtor that are substantial, necessary for a successful reorganization, and equal to or exceeding the value of the junior interest holder's retained interest in the debtor. *See Case v. Los Angeles Lumber Prods., Co.,* 308 U.S. 106, 121–122, 60 S.Ct. 1, 84 L.Ed. 110 (1939); *Unruh,* 987 F.2d at 1510.

■ We agree with the bankruptcy court's conclusion that Hollywood Park's loan of $3 million is not reasonably equivalent to its retained interest in Sunflower, approximately $6 million. Hollywood Park apparently maintains that its retained interest in Sunflower under the plan would be worthless because the debts of the Woodlands greatly exceed its assets. The Supreme Court has rejected a similar argument:

> Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains "property." Whether the value is "present

or prospective, for dividends or only for purposes of control" a retained equity interest is a property interest to "which the creditors [are] entitled ... before the stockholders [can] retain it for any purpose whatever."

*Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 208, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (quoting *Northern Pacific Railway Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct. 554, 57 L.Ed. 931 (1913)); *see In re Wynnefield Manor Assocs.,* 163 B.R. 53, 57–58 (Bankr. E.D.Pa.1993) (rejecting debtor's argument that it satisfied the "proportionate contribution" requirement simply because there is no equity in the property retained by the debtor).

■ In addition to the bankruptcy court's finding that Hollywood Park's contribution is not reasonably equivalent to the value of The Woodlands, we note that Hollywood Park also apparently fails to meet the new value exception because it is not making a substantial capital contribution to the Debtor pursuant to the plan. Under the plan, Hollywood Park simply would loan approximately $3 million to the Debtor during the initial two year period of the plan. Hollywood Park would be repaid all amounts it advanced under the plan. "[T]he infusion of cash by way of a loan generally will not satisfy the new value exception to the absolute priority rule." *In re Eddington Thread Mfg. Co., Inc.,* 181 B.R. 826, 834 (Bankr.E.D.Pa.1995); *see Oxford Life Ins. Co. v. Tucson Self–Storage, Inc. (In re Tucson Self–Storage, Inc.),* 166 B.R. 892, 899 (9th Cir. BAP 1994). In any event, Hollywood Park's contribution likely cannot be deemed "substantial" where the Debtor is obligated to repay the contribution.

For the above reasons, we agree with the bankruptcy court that the absolute priority rule is unsatisfied under the plan and the new value corollary to this rule is not applicable.

## VIII. Termination Of Third–Party Contracts.

Under Sunflower's proposed plan, certain contractual obligations of Hollywood Park and R.D. Hubbard would be extinguished. Specifically, the plan would terminate (1) the

subordination agreement between Hubbard and the Appellees, (2) the subordination agreement between Hollywood Park and the Appellees, and (3) the stock pledge agreement between Hollywood Park and the Appellees. The bankruptcy court held that termination of the Hubbard subordination agreement and Hollywood Park pledge agreement was beyond the power of Sunflower's plan. *See Sunflower,* 219 B.R. at 598. The bankruptcy court apparently did not address the termination of Hollywood Park's subordination agreement although the same reasoning apparently would apply to all three agreements.

 The court will review de novo the bankruptcy court's legal conclusion that it could not extinguish the contractual obligations of Hubbard and Hollywood Park. *See In re Kirkland,* 86 F.3d at 174. It is unclear from the bankruptcy court's order whether it based its decision on a lack of jurisdiction or power, or both. In any case, we will evaluate whether the bankruptcy court had both subject matter jurisdiction and the equitable power to terminate these third-party agreements. *See In re Digital Impact, Inc.,* 223 B.R. 1, 8 (Bankr.N.D.Okla.1998). The Ninth Circuit has explained:

> Subject matter jurisdiction and power are separate prerequisites to the court's capacity to act. Subject matter jurisdiction is the court's authority to entertain an action between the parties before it. Power under section 105 is the scope and forms of relief the court may order in an action in which it has jurisdiction.

*American Harwoods, Inc. v. Deutsche Credit Corp. (In re American Hardwoods, Inc.),* 885 F.2d 621, 624 (9th Cir.1989) (citations omitted).

### A. *Jurisdiction of Bankruptcy Court.*

Title 28 U.S.C. § 1334(b) grants jurisdiction to the bankruptcy courts to hear "all civil proceedings arising under title 11, or arising in or related to cases under title 11." The obligations of Hollywood Park and Hubbard did not arise under title 11 or in Sunflower's Chapter 11 case. Therefore, the court must determine whether the contractual obligations of Hollywood Park and Hubbard are "related to" Sunflower's Chapter 11 case.

 In this case, the proper test is whether the outcome of any post-petition litigation against the non-debtor would have an effect upon property of the estate or its administration. *See Digital Impact,* 223 B.R. at 12. A proceeding is related to a bankruptcy case if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Donaldson v. Bernstein,* 104 F.3d 547, 552–53 (3d Cir.1997) (quoting *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)). Given Hollywood Park's ownership of 100% of the shares of Sunflower and Hubbard's interest in both Hollywood Park and sunflower, we find that the bankruptcy court had jurisdiction to terminate the contractual obligations of Hollywood Park and Hubbard.

### B. *Equitable Power Of Bankruptcy Court.*

 Section 105 of the Bankruptcy Code grants broad equitable powers to the bankruptcy courts. Section 105, however, "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 207, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). Indeed, "[t]he Code lacks specific authority to reward non-debtor third persons who contribute funding to a plan by discharging certain debts of the non-debtor. The Court may not use its equitable powers to create substantive rights, such as a non-debtor discharge, otherwise unavailable under the Bankruptcy Code." *Digital Impact,* 223 B.R. at 14 (citing *United States v. Sutton,* 786 F.2d 1305, 1307–08 (5th Cir.1986)).

There are three general lines of cases concerning the bankruptcy court's power to grant non-debtor discharges: (1) bankruptcy courts may grant non-debtor discharges in its discretion, (2) bankruptcy courts may not grant non-debtor discharges, and (3) bankruptcy courts may grant non-debtor discharges if certain factors are satisfied. *See In re Arrowmill Dev. Corp.,* 211 B.R. 497, 504–05 (Bankr.D.N.J.1997). The Tenth Circuit follows the second line of cases. *See In*

*re Western Real Estate Fund, Inc.*, 922 F.2d 592, 602 (10th Cir.1990).

■■■■ The Tenth Circuit has held that while bankruptcy courts may grant pre-confirmation injunctions or temporary stays in favor of non-debtors, they may not grant post-confirmation injunctions which effectively relieve a non-debtor from its liability to a creditor. *See Western Real Estate*, 922 F.2d at 601–02; *American Hardwoods*, 885 F.2d at 624–25. While a debtor enjoys broad benefits under section 524(a) of the Bankruptcy Code, "Congress did not intend to extend such benefits to third-party bystanders." *See Western Real Estate*, 922 F.2d at 600 citing Collier on Bankruptcy, ¶ 524.01[3], at 524–16 (1st ed.1990) (internal citations omitted). Under section 524, "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). "What is important to keep in mind is that a discharge in bankruptcy does not extinguish the debt itself but merely releases the debtor from personal liability. . . . The debt still exists, however, and can be collected from any other entity that may be liable." *Western Real Estate*, 922 F.2d at 600 (quoting *In re Lembke*, 93 B.R. 701, 702 (Bankr.D.N.D.1988)). Under the Bankruptcy Code, "[n]either the confirmation of a plan nor the creditor's recovery (of partial satisfaction) thereunder bars litigation against third parties for the remainder of the discharged debt." *Western Real Estate*, 922 F.2d at 601. In *Western Real Estate*, the Tenth Circuit applied the above principles to conclude that a bankruptcy court's equitable power's under section 105 of the Bankruptcy Code do not permit the bankruptcy court to relieve nondebtors from their obligations to a creditor. *See id.* at 602 ("Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection.").

■■■■ Appellants argue that the principles in *Western Real Estate* do not apply to this case because Hollywood Park and Hubbard are not guarantors. Appellants do not cite any authority recognizing a distinction between a guarantor and any other non-debtor

concerning the termination of their obligations in bankruptcy. Moreover, the Tenth Circuit's language in *Western Real Estate* is broad sweeping and does not appear to be limited to any particular type of non-debtor. *See id.* at 600 (debt can still be recovered from "any other entity" that may be liable); *id.* at 601 (confirmation of plan discharges debtor but not "anyone else"); *id.* (litigation against "third parties" is not barred); *id.* at 601–02 (bankruptcy court does not have authority to relieve "nondebtor" from its liability to a creditor). Following the Tenth Circuit's holding in *Western Real Estate*, we find that the bankruptcy court correctly held that the contractual obligations of Hubbard and Hollywood Park could not be terminated under Sunflower's reorganization plan.

Even under the more permissive standard adopted by many courts outside the Tenth Circuit, Sunflower cannot terminate the contractual obligations of Hollywood Park and Hubbard under its reorganization plan. For example, the Fourth Circuit affirmed a permanent injunction issued in favor of a non-debtor because the debtor satisfied five factors: (1) the reorganization plan (including the injunction) was overwhelmingly approved (specifically, over 94% of 195,000 claimants), (2) the plan provided full payment of the creditors' claims, (3) the injunction affected very few claimants (specifically 1.5%), (4) the injunction was "essential" to the reorganization plan, and (5) the reorganization "hinged" on the debtor being free from subsequent litigation. *See Menard–Sanford v. Mabey (In re A.H. Robins Co., Inc.)*, 880 F.2d 694, 702 (4th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989). Here, the proposed injunction certainly is not "essential" and would affect five claimants with claims totaling nearly $30 million. Moreover, Appellants clearly cannot meet the first factor—creditor approval. In one of the primary cases cited by Appellants, *In re Master Mortgage Inv. Fund, Inc.*, 168 B.R. 930, 938 (Bankr.W.D.Mo.1994), the court noted that creditor approval is "the single most important factor" in determining whether a discharge of a non-debtor's obligations is appropriate. In *Master Mortgage*, the bankruptcy court allowed termination of a third party

contract where approximately 95% of the creditors impaired by the proposed termination approved of the plan. *See id.*

Appellants also argue that the bankruptcy court had the power to terminate the obligations of Hollywood Park and Hubbard because they contributed substantial assets to Sunflower's reorganization. Although the court in *Master Mortgage* recognized such contributions as a factor in determining whether to terminate obligations of non-debtors, the court emphasized that creditor approval is critical to allowing the termination of third-party obligations. *See id.* at 937–38.

In sum, we conclude that the bankruptcy court correctly held that it does not have the power to terminate the contractual obligations of Hubbard and Hollywood Park over the objections of the Creditor Group.[8]

## IX. Appellants' Notion To Designate Votes.

 Debtor and Hollywood Park contend that the bankruptcy court should have afforded them a meaningful opportunity to develop and present evidence in support of their motion to designate the votes of the Creditor Group, pursuant to 11 U.S.C. § 1126, as having been made in bad faith. The bankruptcy court allowed Appellants to present evidence on this issue at trial. We review the bankruptcy court's decision to hear the evidence as part of the trial for an abuse of discretion. *See United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re United States Abatement Corp.),* 39 F.3d 556, 560 (5th Cir. 1994).

 We adopt verbatim the reasoning of the bankruptcy court on this issue:

At an early status conference, the Creditor Group's counsel characterized the whole case as nothing but a fight between two gamblers, Hubbard and Grace. The evidence shows that like Sunflower and

Hollywood Park, William Grace had his own aspiration of working out some cooperative arrangement with the Wyandotte Tribe of Oklahoma to salvage The Woodlands. The Grace-controlled Creditor Group's announcement that it would vote against Sunflower's plan reinforced this view of Grace's intentions.

Knowing that no consensual plan was in sight, on November 6, 1997, the Court set two dates. The first date, December 18, 1997, was established for reporting on the plan vote. The second date, January 22, 1998, was established to hear evidence in a cramdown hearing, which all parties and the Court anticipated.

From time to time, counsel for Sunflower and Hollywood Park have complained at status conferences about Mr. Grace's actions of buying claims. At one point, Sunflower's counsel forecast a challenge under § 1126(e) to the Creditor Group's vote against the plan. He apparently viewed Mr. Grace's claim purchases as having been made in bad faith. Neither Sunflower nor Hollywood Park formally complained, however, until January 13, 1998. On that date, they filed a joint motion to designate the Creditor Group's vote under § 1126(e) as cast in bad faith and a joint motion to modify a confidentiality order to reveal what Mr. Grace paid for the Claims. The Court first saw these motions at a status hearing on Friday, January 16, 1998, shortly before trial. Trial was scheduled for the following Thursday, January 22, 1998. The Court advised counsel that it would review the motions and announce how he would handle them. At the beginning of the trial on January 22, the Court announced with respect to the joint motion to designate claims under § 1126(e) that "The Court does not need to rule on this motion until the evidence is in." As to the joint motion to modify the confidentiality order the court stated: "The Court will

---

8. There also may be constitutional implications where bankruptcy courts terminate non-debtor obligations. One bankruptcy court has noted:

A release, or permanent injunction, contained in a confirmed plan, however, has the effect of a judgment—a judgment against the claimant and in favor of the non-debtor, accomplished

without due process. Neither the non-debtor, nor the claimant, have an opportunity to present their claims or defenses to the court for determination by way of an adversary proceeding, which is required under Bankruptcy Rule 7001.

*Digital Impact,* 223 B.R. at 13 n. 6.

rule on this motion if and when it becomes necessary during the trial."

Nothing on these issues was presented at trial. So far as the evidence shows, Grace's only sin is purchasing claims at a discount. Purchasing claims at a discount is not bad faith. If Sunflower and Hollywood Park had more damning evidence against Grace, they should have brought the designation issue before the Court earlier in the case or dealt with it at trial. The evidence is now in and it is too late to designate claims under § 1126(e).

Furthermore, even if all of the Gaming entities' claims were found to have been cast in bad faith, Class 1 would still have rejected the plan. The remaining claim holders, Bank Midwest, N.A., and FCLT Loans, L.P., voted to reject the plan.

*Sunflower*, 219 B.R. at 606–07 (footnotes omitted).

Bankruptcy Judge Flannagan gave Debtor and Hollywood Park the opportunity to present evidence at trial but Debtor and Hollywood Park did not avail themselves of this opportunity. Accordingly, the bankruptcy court's decision to allow Hollywood Park and Sunflower to present evidence regarding the designation of votes as part of the trial does not constitute an abuse of discretion. *See United States Abatement Corp.*, 39 F.3d at 560 ("an appellate court should be loathe to substitute its judgment for the bankruptcy court regarding [ ] matters of docket management absent an abuse of discretion").

## X. Denial Of Opportunity To Amend Plan.

■ The court reviews the bankruptcy court's decision to deny further plan amendments under an abuse of discretion standard. *See In re Woodbrook Assocs.*, 19 F.3d 312, 322 (7th Cir.1994); *see also United States Abatement Corp.*, 39 F.3d at 560 (docket management decisions subject to abuse of discretion standard). Appellants maintain that the bankruptcy court erred in its April 8 order by denying Sunflower any opportunity to amend its plan or to request further proceedings toward its confirmation. *See Sunflower*, 219 B.R. at 607. Notably, Appellants do not cite any authority for the proposition that a bankruptcy court must give debtors multiple opportunities to have a plan confirmed.

The bankruptcy court gave Sunflower several chances and approximately 20 months to develop a confirmable reorganization plan. The bankruptcy court extended Sunflower's exclusive period for filing a plan more than once based on Sunflower's attempts to convince the Kansas Legislature to allow casino gambling at The Woodlands. Finally, on May 21, 1997, the bankruptcy court stated that Sunflower "shall file [a reorganization] plan on or before 6/30/97—no further extensions allowed." ROA No. 14. Sunflower filed its first plan on July 15, 1997, after an additional extension of time was granted by the bankruptcy court. On several occasions thereafter, the bankruptcy court advised Debtor's counsel of problems with the proposed plan. *See, e.g.,* ROA No. 26, Trans. of Aug. 12, 1997 Hearing, at 186–87 (the bankruptcy court "has advised the debtor's counsel that the plan is in dire need of amendment"). Accordingly, Sunflower filed a first amended plan on September 16, 1997, and a second amended plan on October 31, 1997. Sunflower was well aware that the bankruptcy court intended to have only one confirmation hearing on Debtor's reorganization plan and that if that plan was not confirmed, the Creditor Group's plan would be implemented or the case would otherwise be terminated shortly thereafter. *See, e.g.,* ROA No. 26, Trans. of August 12, 1997 Hearing, at 189 ("I guess the bottom line is that for the creditor group I can only say in addition to this adequate protection we will move this case to a prompt confirmation hearing and either get a confirmed plan or it will be over with and I would hope that would happen within the next two months or perhaps a little longer."); ROA No. 57, Trans. of Oct. 27, 1997 Hearing at 46 ("The Court does not rewrite plans of reorganization. It only rules on whether or not they are confirmable and we're going to be on a track to dispose of this case one way or the other. . . . If [the Debtor's plan] is not confirmable, the creditors' plan can then be quickly put into effect. . . .").

■ In sum, the bankruptcy court gave Debtor numerous extensions and opportuni-

ties to develop a confirmable plan. After a one week confirmation hearing, the bankruptcy court found that the plan was not confirmable for several fundamental reasons. Based on the record evidence, we find that the bankruptcy court did not abuse its discretion by denying the Debtor any further opportunity to amend its plan. *See Woodbrook*, 19 F.3d at 322 ("Bankruptcy courts are given a great deal of discretion to say when enough is enough.").

IT IS THEREFORE ORDERED that the bankruptcy court's judgment and order of April 8, 1998, denying confirmation of Sunflower's Second Amended Plan of Reorganization are AFFIRMED.